Joseph H. Harrington
United States Attorney
Eastern District of Washington
Daniel Hugo Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

Joseph H. Hunt
Assistant Attorney General
Michael D. Granston
Sara McLean
Don Williamson
Alexandra N. Wilson
Attorneys, Civil Division
U.S. Department of Justice
Washington, D.C. 20004

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF WASHINGTON

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: |
| ) | |
| v. ) | |
| ) | |
| MISSION SUPPORT ALLIANCE, LLC, ) | |
| LOCKHEED MARTIN SERVICES, INC., ) | **JURY TRIAL REQUESTED** |
| LOCKHEED MARTIN CORPORATION, ) | |
| and ) | |
| JORGE FRANCISCO "FRANK" ARMIJO, ) | |
| ) | |
| Defendants. ) | |

_____)

UNITED STATES' COMPLAINT - 1

### UNITED STATES' COMPLAINT

1. The United States brings this action for treble damages and penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, for civil penalties under the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707, and for damages under the common law theories of unjust enrichment, breach of contract, and payment by mistake. Defendants Mission Support Alliance, LLC (MSA), Lockheed Martin Services, Inc. (LMSI), Lockheed Martin Corporation (LMC), and Jorge Francisco "Frank" Armijo (Armijo) (collectively, Defendants) knowingly made and used numerous false records and statements material to the Department of Energy (DOE), and falsely and fraudulently billed the DOE for tens of millions of dollars in unallowable profit and/or fee included in Defendants' false and fraudulent claims. Additionally, Defendants' claims paid by DOE included millions of dollars in improper kickbacks that LMC and LMSI paid to MSA and its officers, including Armijo, in order to obtain and reward favorable treatment with respect to LMSI's subcontract to MSA, in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707.

2. In their effort to obtain DOE consent to a subcontract between MSA and LMSI on which LMSI received hundreds of millions of dollars in revenue and tens of millions of dollars in profit, Defendants repeatedly and knowingly misrepresented and omitted critical and material information regarding LMSI's anticipated profit, LMSI's anticipated level of effort, labor costs and rates charged by LMSI to MSA, MSA's visibility into LMSI's internal cost and revenue estimates, and Defendants' compliance with applicable Anti-Kickback Act requirements. Defendants' knowingly false and fraudulent statements and half-truths caused DOE to pay Defendants tens of millions of dollars of inflated claims and unallowable profit.

3. After Defendants used their knowingly false and fraudulent statements and half-truths to obtain conditional DOE consent to the subcontract between MSA and LMSI, LMSI billed MSA for hundreds of millions of dollars on the subcontract, including tens of millions of dollars in unallowable profit to LMSI and LMC that

DOE had explicitly and repeatedly informed Defendants would not be permitted. LMC and LMSI then paid Defendants' employees, including Armijo, millions of dollars in incentive compensation specifically tied to these employees' successful efforts in improperly obtaining favorable treatment and profit for Defendants with respect to the MSA contract and the LMSI subcontract, all obtained through Defendants' corrupt conduct, false statements, misrepresentations, omissions, half-truths, and outright lies.

## I.    JURISDICTION AND VENUE

4.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 -3733, the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707, and common law.  This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345 and 1355.  The Court may exercise personal jurisdiction over the Defendants because the Defendants reside and transact business in this District, and because they committed proscribed acts in this District.

5.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c), as the place where Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

## II.    PARTIES

6.    Plaintiff in this action is the United States of America.

7.    The United States Department of Energy (DOE) is a cabinet-level executive agency of the United States whose mission is to ensure America's security and prosperity by addressing its energy, environmental and nuclear challenges through transformative science and technology solutions.  As part of its statutory responsibilities, the DOE is responsible for the management and cleanup of certain nuclear sites, including the Hanford Nuclear Site located in the Eastern District of Washington.

8.    Defendant Mission Support Alliance, LLC (MSA) is a limited liability Delaware corporation with its principal place of business located in Richland,

Washington.  During the time period relevant to this Complaint, MSA was owned by three entities: (1) Lockheed Martin Integrated Technology, a wholly-owned subsidiary of Lockheed Martin Corporation (LMC); (2) Wackenhut Services, Inc. (Wackenhut); (3) and Jacobs Engineering Group, Inc. (Jacobs).  MSA was created by these entities for the purpose of bidding on, and performing, the Mission Support Contract, a multi-billion dollar DOE prime contract.

9.     Defendant Lockheed Martin Services, Inc. (LMSI) is a limited liability Delaware corporation with its principal place of business in Rockville, Maryland. During the relevant time period, LMSI was a wholly-owned subsidiary of LMC, and maintained offices and employees in Richland, Washington.

10.     Defendant LMC is a Maryland corporation with its principal place of business in Bethesda, Maryland.  During the relevant time period, LMC, through its subsidiaries and employees, transacted business in the Eastern District of Washington.

11.     During much of the relevant time period, Defendant Jorge Francisco "Frank" Armijo was a resident of the Eastern District of Washington working at LMC and MSA.  Until MSA's creation, Armijo served as an LMC Vice President.  When MSA was created to bid on and perform the Mission Support Contract, Armijo continued his role as an LMC Vice President but also simultaneously served as MSA's Vice President for Information Technology.  In December 2009, Armijo briefly left MSA to participate in an LMC executive program.  In May 2010, Armijo rejoined MSA as its President and General Manager, while again continuing to serve as an LMC Vice President.

12.     At all relevant times, each individual MSA, LMSI, or LMC employee had both apparent and actual authority to act on behalf of his or her employer in carrying out the conduct and acquiring the knowledge set forth in this Complaint. During the relevant time period, LMSI did not have its own employees and officials, and instead acted through LMC employees and officials that had actual and apparent authority to act on behalf of LMSI and who were also acting simultaneously with

UNITED STATES' COMPLAINT - 4

apparent and actual authority and on behalf of LMC. LMC employees such as Frank Armijo and Richard A. "Rich" Olsen, an LMC official who also acted as MSA's Chief Financial Officer, were "seconded" to work for MSA but nonetheless continued to perform functions and exercise responsibilities for LMC and LMSI related to the conduct set forth in this Complaint. These individuals had apparent and actual authority to act on behalf of MSA, LMC, and LMSI, and did so.

### III.    RELEVANT STATUTORY AND REGULATORY BACKGROUND

### The False Claims Act

13.    Originally enacted in the 1860s to combat rampant fraud against the Union Army during the Civil War, the False Claims Act, 31 U.S.C. §§ 3729-3733, is the primary tool with which the United States combats false claims and fraud against the Government and protects the federal fisc. *U.S. ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.*, 722 F.Supp. 607, 608 (N.D. Cal. 1989) (*quoting* 36 R. Tomes, The Fortunes of War, Harper's New Monthly Magazine 228 (July 1864) ("For sugar [the government] often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols the experimental failures of sanguine inventors, or the refuse of shops and foreign armories."). The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White*, 390 U.S. 228, 232, 88 S.Ct. 959 (1968).

14.    The False Claims Act provides, in pertinent part, that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

UNITED STATES' COMPLAINT - 5

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (2010).

15.     The False Claims Act defines "knowingly" as follows:

(1)   the terms knowing and knowingly –
(A)   mean that a person, with respect to information –

(i)   has actual knowledge of the information;

(ii)   acts in deliberate ignorance of the truth or falsity of the information; or

(iii)   acts in reckless disregard of the truth or falsity of the information; and

(B)   require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

16.     The False Claims Act provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus additional civil penalties for each violation.  31 U.S.C. § 3729(a)(1).

**THE ANTI-KICKBACK ACT**

17.     The Anti-Kickback Act was enacted by Congress and amended in 1986 to fight a specific type of corruption that Congress believed had become "rampant" and "nationwide": commercial bribery in which contractors or their employees provide things of value to other contractors or their employees in return for favorable treatment on government contracts and subcontracts.   See H.R. Rep. No. 99-964, at 5 (1986), reprinted in 1986 U.S.C.C.A.N. 5960, 5963.  Kickbacks, Congress found, not only undermined the integrity of the federal procurement process through the obvious and clear conflicts of interest that they created, but increased the cost of goods and

services to the taxpayer because the amount of such kickbacks was invariably included in the amounts charged to the government.  *Id.*

18.     The Anti-Kickback Act, 41 U.S.C. §§ 8701-8707, provides that "[a] person may not (1) provide, attempt to provide, or offer to provide a kickback; (2) solicit, accept, or attempt to accept a kickback; or (3) include the amount of a kickback prohibited by paragraph (1) or (2) in the contract price — (A) a subcontractor charges a prime contractor or a higher tier subcontractor; or (B)  a prime contractor charges the Federal Government."  41 U.S.C. § 8702.

19.     The Anti-Kickback Act defines a "kickback" as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract."  41 U.S.C. § 8701.

20.     A person or entity that knowingly pays or receives a kickback, or includes the amount of a kickback in subcontract or contract charges, is liable to the United States for twice the amount of the kickback, plus additional penalties for each kickback.  41 U.S.C. § 8706.

21.     The terms of the Mission Support Contract expressly included and incorporated the requirements of the Anti-Kickback Act.  Mission Support Contract, Section I.6.

**THE FEDERAL ACQUISITION REGULATION**

22.     The Federal Acquisition Regulation (FAR), 48 C.F.R. Part 1, requires, in relevant part, that "Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none.  Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct."  48 C.F.R. § 3.101-1.

UNITED STATES' COMPLAINT - 7

23.    FAR 9.505 contains requirements regarding organizational conflicts of interest, which are defined generally as situations in which a contractor or subcontractor either: (1) has an unfair competitive advantage in agency contracting or subcontracting; or (2) is placed in a situation that might bias its work for the federal agency.

24.    One situation, specifically discussed in the FAR, that creates an organizational conflict of interest is when a contractor or subcontractor is in the position of evaluating its own offers for products or services, "without proper safeguards to ensure objectivity to protect the Government's interests."  48 C.F.R. § 9.505-3.

25.    The FAR also incorporates the Anti-Kickback Act's prohibitions on providing or receiving anything of value in an effort to receive, obtain, or reward favorable treatment on a government contract or subcontract.  48 C.F.R. §§ 3.502-1 – 3.502-3.

**THE REQUIREMENT FOR FAIR AND REASONABLE PRICES IN GOVERNMENT CONTRACTING**

26.    The FAR requires that government contracting officers and prime contractors, such as MSA, must "purchase supplies and services from responsible sources at fair and reasonable prices."  48 C.F.R. § 15.402(a).  This requirement applies to all contract types whether a firm fixed price contract (a contract with an agreed upon total price that is not subject to any adjustment based on the contractor's costs incurred while performing the contract), a fixed unit rate contract (a contract based on estimated quantities of items and agreed upon unit rates, including labor rates), a time and materials contract (a contract used to acquire goods or services on the basis of direct labor hours at a specified fixed hourly rate with goods/materials priced at cost plus, potentially, material handling costs), or any combination thereof.

27.    The Truth in Negotiations Act (TINA), 10 U.S.C. § 2306a, provides, in relevant part, that "[w]hen certified cost or pricing data are not required to be

UNITED STATES' COMPLAINT - 8

submitted under this section for a contract, subcontract, or modification of a contract or subcontract, the contracting officer shall require submission of data other than certified cost or pricing data to the extent necessary to determine the reasonableness of the price of the contract, subcontract, or modification of the contract or subcontract." 10 U.S.C. § 2306a(d).

28.    Under a cost-reimbursement contract such as MSA's Mission Support Contract, MSA was entitled to receive payment only for those costs that were allowable, allocable, and reasonable under applicable-cost-reimbursement principles and compliant with contract requirements.  48 C.F.R. § 31.201-2.

29.    A contractor such as MSA bears the burden of establishing that its claimed costs to DOE are allowable, allocable, and reasonable.  In determining reasonability, special attention is paid to ensure that costs associated with non-arm's-length transactions between affiliated entities are reasonable.  48 C.F.R. § 52.216-7; 48 C.F.R. § 31.201-2; 48 C.F.R. § 52.242-3.

30.    A contractor who requests reimbursement for unallowable or unreasonable costs is subject not only to disallowance of the unallowable or unreasonable costs, but to penalties.  48 C.F.R. § 52.216-7; 48 C.F.R. § 31.201-2; 48 C.F.R. § 52.242-3.

31.    Finally, if a contractor becomes aware that the Government has overpaid on a contract financing or invoice payment, the contractor shall remit the overpayment amount to the Government. A contractor may be suspended and/or debarred for knowing failure by a principal to timely disclose credible evidence of a significant overpayment.  48 C.F.R. § 3.1003(a)(3).

## III.    BACKGROUND

### The Hanford Site

32.    DOE's Hanford Site is a 586 square mile site located in the Eastern District of Washington.  The Hanford Site is a mostly-decommissioned nuclear production complex that has been operating since the 1940s, initially by the United

States Army, during which time it was used to generate plutonium used in the Trinity test detonation in New Mexico, and in the "Fat Man" atomic bomb detonated over Nagasaki, Japan, which helped end World War II.

33.  The Hanford Site relied on the nearby Columbia River and its large volume of water to cool the Hanford Site nuclear reactors, which required, at times, over 75,000 gallons of water per minute to be pumped from the Columbia River through the site.

34.  After decades of plutonium production throughout the Cold War, in 1987, the Hanford Site ceased producing plutonium and DOE began one of the largest and most complex nuclear and environmental cleanup projects in history.  As part of these efforts, DOE employs personnel at multiple offices located in Richland, Washington and contracts with numerous contractors employing thousands of workers involved in the cleanup efforts.

**The Mission Support Contract**

35.  Mission support, including logistical support, training, occupational health, information technology, site security, and the like, is essential to the success of the Hanford Site cleanup mission from an operational, safety, and security standpoint. To that end, in May 2007, DOE issued a Request for Proposals for the Mission Support Contract to be performed at the Hanford Site.  As set forth in the statement of work, the purpose of the Mission Support Contract was to provide direct support to DOE and its contractors with cost-effective infrastructure and site services integral and necessary to accomplish the Hanford Site environmental cleanup mission. The scope includes five primary functions: 1) Safety, Security and Environment, 2) Site Infrastructure and Utilities, 3) Site Business Management, 4) Information Resources/Content Management, and 5) Portfolio Management.

36.  The Request for Proposals issued by DOE provided that the Mission Support Contract was to be a cost-reimbursement plus award fee contract in which the contractor would receive full reimbursement for its allowable, reasonable, and

UNITED STATES' COMPLAINT - 10

allocable incurred costs (incorporating the FAR provisions above regarding allowability and reasonableness of costs), and, as its profit on the contract, would receive an award fee based on its performance, including how successful the contractor was in limiting the cost to DOE.

37.    The Request for Proposals issued by DOE contained clause B.11, which was incorporated into the Mission Support Contract and which specifically prohibited the contractor from charging to DOE any additional profit through any subcontracts to any affiliate companies of the contractor except under narrow excepted circumstances. Clause B.11 provided the following:

> B.11 ALLOWABILITY OF SUBCONTRACTOR FEE
>
> (a)    If the Contractor is part of a teaming arrangement as described in FAR Subpart 9.6, Contractor Team Arrangements, the team shall share in the Total Available Fee as shown in Table B.4-1. Separate additional subcontractor fee is not an allowable cost under this Contract for individual team members, or for a subcontractor, supplier, or lower-tier subcontractor that is a wholly-owned, majority-owned, or affiliate of any team member.
>
> (b)    The subcontractor fee restriction in paragraph (a) does not apply to members of the Contractor's team that are: (1) small business(es); (2) Protégé firms as part of an approved Mentor-Protégé relationship under the Section H Clause entitled, Mentor-Protégé Program; (3) subcontractors under a competitively awarded firm-fixed price or firm-fixed unit price subcontract; or (4) commercial items as defined in FAR Subpart 2.1, Definitions of Words and Terms.

38.    Similarly, the Request for Proposals, ultimately incorporated into and made part of the Mission Support Contract at Section I, explicitly required that the contractor comply with: (1) the requirement that all costs charged by the Contractor, including subcontractor costs, were allowable, allocable, and reasonable; (2) the requirement to obtain agency consent for large subcontracts; and (3) requirements to avoid conflicts of interest and to comply with the Anti-Kickback Act.

UNITED STATES' COMPLAINT - 11

39.    The Mission Support Contract, section H.30, required that LMC, as the parent company for MSA, execute a guarantee for MSA's performance and assume joint and several liability arising out of MSA's performance.   Steve Lubniewski, an LMC executive, executed this guarantee on behalf of LMC and MSA.

## V.    DEFENDANTS' FRAUDULENT SCHEME TO OVERCHARGE DOE AND TO OBTAIN UNALLOWABLE AND UNREASONABLE ADDITIONAL PROFIT FOR LMSI AND LMC

### MSA's Initial Proposal

40.    On May 5, 2007, LMC submitted a Notice of Intent to Offer for the Mission Support Contract, stating that LMSI and Jacobs would be establishing a Joint Venture, MSA, for the contract and that Wackenhut was intended to serve as a major subcontractor.

41.    On May 27, 2007, LMC conducted an internal "profit versus fee analysis" regarding its intended proposal for the Mission Support Contract and a potential subcontract to LMC or any of its affiliates, and determined that LMC would not be permitted to include any additional profit with regard to any fixed price amounts for which Lockheed entities subcontracted with MSA, and that any LMC affiliates could not earn additional fee.

42.    In response to the profit versus fee analysis, Frank Figueroa, an LMC employee who was later "seconded" to MSA as its President, suggested in an email to other LMC employees that the contract scope of work for the Information Resource/Content Management might be considered commercial and therefore LMC might be able to claim additional fee through a subcontract with MSA per the exclusion for "commercial items" in clause B.11(4), notwithstanding that LMC and MSA were affiliates and that MSA, and therefore LMC, would already be earning profit on the work through the prime contract.

UNITED STATES' COMPLAINT - 12

43.    In June 2007, LMC and its teaming partners revised the MSA Joint Venture structure to include Wackenhut as a Joint Venture member and Lockheed Martin Integrated Technologies as the LMC member.  LMC and MSA proposed LMSI as a subcontractor and teaming member to MSA to provide the Information Resources/Content Management (IR/CM) scope of work.

44.    As of June 28, 2007, despite not having prepared an actual subcontract proposal, LMC, in its internal business case, projected the LMSI subcontract for the IR/CM work under the Mission Support Contract to be approximately $295.6 million over 10 years, including approximately $35.5 million in additional profit for LMC over and above the profit already to be earned by LMC on the IR/CM work as part owner of MSA.

45.    LMC and its teaming partners submitted the MSA proposal for the Mission Support Contract on July 16, 2007.  After receiving proposals, DOE engaged offerors in a series of questions and answers and requested offerors submit Final Proposal Revisions.  LMC and its teaming partners submitted the MSA Final Proposal Revision on May 12, 2008.  As a part of its Final Proposal Revision, the MSA proposal stated that LMSI was a preselected subcontractor for the IR/CM work scope, and proposed a firm fixed price subcontract in the amount of $275,672,433 for Fiscal Years 2009 through 2018.  The proposed LMSI subcontract was for labor only and represented that the rates used to price the subcontract were from LMSI Contract Number GS-35-F-4863G (Contract 4863G), an existing LMSI government contract with the United States General Services Adminstration (GSA).

46.    As a part of the proposal process, at DOE's request, the Defense Contract Audit Agency (DCAA), a United States agency that performs audit and financial advisory services for the Department of Defense and other federal agencies, reviewed the MSA proposal, including the proposed LMSI subcontract.  In June of 2008, as a part of its review, DCAA questioned $59,545,246 of LMSI's proposed cost as unallowable profit which was included within the proposed GSA rates.

47.    MSA did not independently review the LMSI subcontract proposal before MSA and LMC submitted it as part of MSA's proposal.  Rather, after LMC submitted MSA proposal and the LMSI subcontract proposal, and after DCAA had commenced its audit, LMC executive Frank Armijo and LMC's GSA contract manager Jeffrey Chesko prepared a "technical analysis," "price analysis," and "sole source justification" solely to respond to the DCAA audit.  Frank Armijo falsely told DCAA that these analyses had been performed by MSA prior to the submission of the Final Proposal Revision, when in fact LMC had merely created them for the DCAA audit in order to suggest that MSA and LMC had meaningfully analyzed LMSI's subcontract proposal.

48.    DOE awarded the Mission Support Contract to MSA in September 2008.  Later that month, another offeror submitted a bid protest with the United States Government Accountability Office (GAO) on September 22, 2008.  As part of its protest, the offeror challenged DOE's determination to award the contract to MSA because it contended that MSA would include additional profit to LMSI that would significantly increase the cost of performance by MSA relative to that of the other offeror.  DOE responded that it would not allow any additional profit to LMC or any affiliate of LMC because it would not be allowable or reasonable under the contract.  MSA, LMC, and LMSI were aware of DOE's position and did not express disagreement.  Ultimately, the protest was dismissed by GAO on December 29, 2008 based on a DOE notice of intent to take corrective action.  Based on its determination that additional LMSI profit would not be included in the LMSI subcontract and its notice of intent to the GAO that it would not allow any such profit, DOE reevaluated the proposals and re-awarded the Mission Support Contract to MSA on April 28, 2009.

49.    In its debrief to MSA following award of the Mission Support Contract, DOE's Contracting Officer Alan Hopko notified MSA and LMC that while he would permit MSA to subcontract the IR/CM work to LMSI, he would not permit any

additional profit to LMSI or LMC on any such subcontract, because LMC was already earning profit on this work through its part ownership of MSA and that he would therefore consider any additional profit on the work to be unallowable and unreasonable. Hopko's memorandum documenting the debriefing, a copy of which was provided to MSA, LMSI, LMC, and Armijo, stated the following: "[a]s the Contracting Officer, I would not consent to this subcontract as presented, because I believe these costs to be unreasonable and unallowable. I would consent, however, to this subcontract if it did not include fee."

50.     As LMC executive and MSA President Frank Figueroa noted in a May 2009 email to Frank Armijo, Rich Olsen, and other MSA officers, during the debrief, DOE "[was] even more forceful" than it had been previously "about rejecting [LMC's] fee argument."

51.     The MSA Contract period of performance began August 1, 2009.

**LMSI Subcontract with MSA for the IR/CM Workscope**

52.     After DOE's award of the Mission Support Contract to MSA, LMC and LMSI employees began preparing a new subcontract proposal for the IR/CM work scope. LMC, LMSI, and MSA understood that this subcontract proposal would require consent by DOE due to its size.

53.     In June 2009, Frank Armijo, revised the structure of the LMSI subcontract for the IR/CM from entirely firm fixed price with rates allegedly from LMSI's Contract 4863G to a subcontract that would utilize a variety of fixed unit rates, firm fixed price and time and materials services. At this time, Armijo, MSA, LMC, and LMSI projected upwards of $60 million in additional profit for LMC on the proposed LMSI subcontract, over and above the profit LMC would be earning on this very same work through its MSA prime contract, the Mission Support Contract.

54.     On June 1, 2009, Armijo emailed a number of LMC and MSA executives, including Rich Olsen, MSA's Chief Financial Officer, and Frank

Figueroa, MSA's President, that "[w]e are being asked by DOE to submit a consent package i.e. proposal for our LM subcontract to the MSA.  This will be the main mechanism to justify our subcontract fee (upwards of $60 M) so it is very important."

55.    In July 2009, LMSI submitted its subcontract proposal for internal LMC review.  In an email summarizing the proposal sent to MSA and LMC executives, including Frank Armijo, Rich Olsen, and Frank Figueroa, who were "seconded" to MSA, LMC employee Kyle Willers explained that the subcontract proposal included "GSA rates with a 10% discount" but that, even with this discount, that LMC and LMSI were expecting, in their internal business case, a 10 percent profit.  As Rich Olsen later acknowledged, it was not proper for this communication to go to him, to Frank Figueroa, or to Frank Armijo, all MSA executives, because MSA was supposed to be conducting an evaluation of the proposal to be submitted by LMSI and LMC.

56.    In fact, MSA President Frank Figueroa explicitly acknowledged this impropriety the very next day after receiving this communication.  On July 23, 2009, Figueroa emailed Rich Meyer, MSA's subcontracts manager, Rich Olsen, MSA's Chief Financial Officer but also an LMC employee, Frank Armijo, MSA's Vice President for Information Technology but also an LMC executive, and other MSA and LMC employees an email titled "ENSURING WE HAVE NO CONFLICT OF INTEREST ON THE LMC SUBCONTRACT" (emphasis in original), and admonished them that "[a]t a minimum, I want to make sure that any LMC personnel involved in putting the subcontract proposal together specifically NOT be involved in evaluating the proposal for MSA and NOT be involved in representing MSA's proposal to the DOE . . . it is extremely important that we have very clear lines of demarcation."  (emphasis in original).  Defendants violated this directive.  MSA's President Figueroa, Vice President for Information Technology Armijo, and Chief Financial Officer Olsen, all of whom had received LMSI's internal analysis and profit estimate the prior day from Kyle Willers, were intimately involved in evaluating

LMSI's subcontract proposal and in representing that subcontract proposal to DOE, supposedly on behalf of MSA.

57.    Additionally, as MSA subcontract specialist Frank Campisi later acknowledged, Armijo was responsible for establishing LMSI's pricing in his capacity as an LMC executive, and then evaluating and accepting that pricing in his capacity as an MSA executive, at times negotiating with himself, through his own MSA and LMSI subordinates, to establish and agree to pricing, and then falsely representing to DOE that the pricing had been appropriately and independently evaluated and determined to be fair and reasonable.

58.    Notwithstanding that Willers' internal analysis from July 22, 2009 estimated that LMC could obtain an additional 10 percent on the subcontract while providing a 10 percent discount from its GSA schedule pricing, LMC determined to reduce the amount of the discount to 5 percent and then again to 3 percent, thereby increasing the cost to DOE and further increasing LMC's estimated additional profit for the subcontract, before submitting the proposal to MSA.  Armijo and Olsen participated in these discussions as well.

59.    On July 30, 2009, MSA requested and received authorization from DOE that allowed MSA to purchase LMSI's services directly using LMSI's GSA schedule contract, which is normally available only to government agency customers.  DOE's purpose in providing this authorization was to allow MSA to use LMSI's GSA pricing as a starting point to ensure it would never pay more than the LMSI GSA schedule price, but would have the ability and obligation under FAR 8.405-4 to negotiate for additional discounts off that GSA schedule price.

60.    On July 31, 2009, LMSI submitted to MSA a new proposal for the IR/CM work scope for MSA to propose to DOE.  The proposal contained fixed unit rate services, fixed price services, and time and materials services.  LMSI's proposal falsely represented that "all pricing is based on discounts from LMSI published rates under its GSA Contract No. GS-35-F-4863G," that "the labor rates [were] based on a

three percent discount from [LMSI's] GSA Schedule 70 contract," and that the proposal represented "[d]iscounted GSA time and material labor rates for CY 2009 through CY 2014." LMSI's total subcontract proposal for the five year period of October 1, 2009 to September 30, 2014 was $279,275,789.  This proposal nearly doubled the anticipated revenue for LMSI and the cost to DOE for LMSI's IR/CM services because the total cost for the LMSI subcontract was approximately the same as the LMSI 10-year subcontract proposal included in the MSA submission of May 12, 2008, despite being for only 5 years.

61.    LMSI's proposal grossly and improperly inflated the prices to be charged to MSA and, through MSA, to DOE.  Contrary to its false and fraudulent representations, the subcontract proposal did not use discounted GSA prices as the basis for its labor rates. The subcontract proposal also relied on falsely inflated labor and other direct cost rates.  Furthermore, LMSI and LMC falsely inflated the number of planned full time equivalent (FTE) employees from those that LMC and LMSI internally estimated would be required for fixed unit rate and firm fixed price services.

62.    With respect to labor rates, for each position that LMSI proposed, LMSI and LMC conducted an internal analysis that compared the false and inflated labor rate being proposed to the individual's actual salary plus benefits, to determine the inflation and profit to LMSI and LMC for each position.  For some of these positions, the difference between the actual cost to LMSI and the inflated rate it was charging was 40 percent or more.  As DOE had expressly stated to LMC, LMSI, and MSA, LMC, through its ownership interest in MSA, was already receiving profit on each and every one of these individuals through MSA's prime contract, so LMC and LMSI were not entitled to include any additional profit in any labor rates used to price the subcontract with MSA.  LMSI did not include its internal analysis regarding this improper profit in its subcontract proposal; in fact, it did not include any labor rates at all.  Instead, LMSI's proposal falsely stated that LMSI's proposal represented a 3 percent discount from its GSA schedule prices to make it appear as though it was

UNITED STATES' COMPLAINT - 18

offering discounted prices to benefit DOE and ensure that LMSI and LMC were not receiving improper, unreasonable, and unallowable additional profit on the subcontract.

63.    LMSI sent a letter to DOE in August 2009 responding to DCAA audit of the original LMSI proposal included in MSA's May 12, 2008 submission for the Mission Support Contract.  LMSI stated that since the May 12, 2008 submission it had updated its proposal pricing to include fixed unit prices and time and materials rates, as well as the original firm fixed prices.  LMSI falsely stated to DOE that in its current proposal it proposed a 3 percent discount of the labor rates below the current GSA Schedule rates.

64.    LMSI's letter to DOE further addressed DCAA's initial finding that $59,545,246 of LMSI's subcontract price was unallowable as profit on an affiliate subcontract.  LMSI argued that the services it was offering were commercial and therefore could include profit pursuant to the exceptions in clause B.11(b)(4).  LMSI falsely stated that "LMSI is offering to sell its services to MSA LLC as a commercial item based on a catalog price . . . our discounted prices are based on our GSA Commercial Rate Schedule GS-35F-4863G."  In fact, as LMSI and LMC knew, LMSI's proposed prices were not discounted GSA prices at all, but were grossly inflated rates, and therefore neither "commercially" derived nor fair and reasonable.  Moreover, the pricing for some of the LMSI labor categories, and all of the materials that made up the LMSI proposal, were not even part of the LMSI GSA Schedule.

65.    LMSI also fraudulently disputed DCAA's calculation of $59.5 million in profit, even though LMSI's own internal estimates of its profit over 10 years were nearly identical to DCAA's calculation.  LMSI claimed that the DCAA calculation of profit on the initial LMSI subcontract proposal was incorrect, as DCAA had failed to include burdens for Program Management Overhead and Desktop and Telephone Services in its calculation – attributing those amounts to profit rather than overhead.  LMSI represented that the correct calculation actually would have been 8.13 percent

profit in the LMSI subcontract proposal.  The 8.13 percent reflected the profit included in the Contract 4863G rates that were used in the May 12, 2008 firm fixed price proposal.  LMSI fraudulently concealed from DOE that its revised proposal included additional costs and inflation, that it had grossly inflated the labor rates proposed in its subcontract, as well as its own internal calculations of its anticipated profit, which were well in excess of 8.13 percent and almost identical to DCAA's calculation.

66.    During the preparation of the LMSI subcontract proposal, LMC was negotiating with GSA regarding the consolidation of Contract 4863G into a combined new GSA Schedule 70 with various other LMSI schedules for similar types of work. As LMC's GSA contract manager Jeffrey Chesko acknowledged to MSA employee Elizabeth Lugo, in August 2009, LMSI's GSA Schedule rates had not increased since 2007.  In the fall of 2009, GSA expressly told LMC and LMSI that GSA would not agree to any increase in any GSA labor rates until after this consolidation had been completed, and that, therefore, LMSI's existing GSA labor rates would continue to remain in place indefinitely and for the foreseeable future.  LMC and LMSI communicated GSA's decision to MSA and Armijo.  In September and October 2009, Chesko expressly advised Armijo, Olsen, and Rich Meyer, MSA's subcontract manager, that there would be no change in LMSI's GSA schedule labor rates until after consolidation of the various schedules had been completed.  Chesko also provided Armijo, Olsen, and Meyer with a spreadsheet setting forth LMSI's GSA schedule rates, which showed that: (1) LMSI's actual GSA schedule rates were, in fact, far lower than the supposedly "discounted" rates proposed to MSA and DOE; and (2) even after consolidation of the schedules, the rates being proposed by LMSI to GSA were no higher and, in many respects, far lower, than LMSI's then-existing GSA schedule rates.

67.    On December 3, 2009, MSA discussed with DOE that a consent package for the LMSI subcontract would be submitted in the near future.  During that meeting,

DOE officials explicitly reiterated the DOE position that LMSI could not earn any additional profit on the subcontract, regardless of the type of services – fixed unit rate, firm fixed price, and/or time and materials – offered, because LMC was already earning profit on this very same work through its ownership of MSA and performance of the MSA prime contract.   DOE explicitly communicated its position to Rich Meyer in a meeting on December 3, 2009, who in turn set forth DOE's position in an email that he provided to Armijo, Olsen, and other LMC, LMSI, and MSA personnel.  DOE never changed its position in this regard.

68.    The very same day that DOE explicitly communicated to Defendants, including Armijo, that it would not permit any additional profit to LMSI on the subcontract, LMC internally projected between 10.4 percent and 11.3 percent profit on the subcontract (approximately $30 million in profit over the first 5 years), with 10.4 percent profit ($29 million) described as the "worst case".   Armijo and LMC contracts manager (and future MSA contracts manager) Brad Edwards received these projections in writing on December 7, 2009.  As set forth in the accompanying "business case" document distributed to Armijo, LMC, LMSI, and MSA, while approximately 1.5 percent of this profit was in the form of management efficiencies that LMSI could attempt to realize through efficient performance of the work and therefore was not guaranteed, the remaining amount was profit that was simply inflating the rates that LMSI had proposed to charge MSA.

69.    LMC and LMSI submitted to MSA another revised proposal for the MSA IR/CM subcontract on December 14, 2009.  The proposal again falsely represented that the pricing was "based on discounts from Lockheed Martin Services, Inc. published rates under its General Services Administration (GS), Federal Supply Schedule 70 Contract No. GS-35F-4863G."  LMSI's proposal falsely represented that it was offering a 4 percent discount from its GSA Schedule rates as found in Contract 4863G.  As with the July 2009 proposal, this new proposal did not disclose any rates for the time and materials work, or any details of the components of the fixed unit

rates other than lump sum amounts for individual line items included in the rates.  The total price proposed by LMSI for FY2010 –FY 2014 was $272,589,109.

70.    On January 27, 2010, LMC employee Christine Barker emailed MSA subcontract specialist Frank Campisi a file showing the labor rates that LMSI had proposed to charge MSA and DOE.  Campisi had requested this file because neither the July 2009 LMSI proposal nor the revised December 2009 LMSI proposal contained any labor rates, but merely represented that its proposal represented a 3 percent (for the July 2009 proposal) and 4 percent (for the December 2009 proposal) discount from its GSA schedule rates in LMSI's GSA schedule Contract 4863G.

71.    As MSA knew -- because Campisi, Meyer, Olsen, Armijo, and others had just received LMSI's then-current Contract 4863G rates from Chesko, and been told explicitly by Chesko that these rates would remain in place for the duration of Contract 4863G's existence – the labor rates in the file provided by Barker in January 2010 that LMSI had proposed to MSA were not a 3 percent discount from Contract 4863G, but in fact represented an *inflation* from LMSI's current Contract 4863G rates.

72.    As just one example, as MSA, Armijo, Olsen, Meyer, Campisi, LMSI, and LMC knew, LMSI's then-current and approved GSA schedule rate for Quality Assurance Manager as of January 2010 was $75.79/hour, a rate which had also been in place for all of 2009.  As the rate schedule received from Ms. Barker made clear, however, LMSI had proposed to MSA a rate of $80.19/hour for 2009 and a rate of $82.57/hour for 2010, which was not a 3 percent discount from LMSI's GSA rate, as LMSI had falsely represented, but in fact was a *9 percent inflation* of LMSI's GSA rate.  Moreover, as MSA, Armijo, Olsen, Meyer, Campisi, LMSI, and LMC knew, due to falling labor costs, LMSI was actually seeking to *decrease* its GSA rate at that time for future contracts – it had proposed to GSA a new Quality Assurance Manager rate of $70.48/hour.

73.    LMSI inflated the rates proposed to MSA by taking its current, published GSA labor rates and applying an "escalation factor" for each year since 2007, even though LMSI and MSA were aware, as of January 2010, that LMSI's current published GSA rates as found in Contract 4863G had not increased since 2007, nor was LMSI, in January 2010, even *seeking* from GSA any escalation or increase in its rates; indeed, like the Quality Assurance Manager rate discussed above, LMSI was actually proposing to *decrease* a number of its rates, which LMSI, MSA, LMC, and Armijo concealed from DOE.

**MSA Requests Consent to the LMSI Subcontract**

74.    On January 29, 2010, MSA submitted to DOE a package requesting DOE's consent to MSA's award of a subcontract to LMSI for the IR/CM work scope. In the consent request, MSA notified DOE that MSA had already issued a notice to proceed for LMSI to begin work, in order to provide continuity of service because MSA had taken over the Mission Support Contract in late 2009, but included provisions to "incorporate all final [DOE] review comments."  As all Defendants understood, due to the size of the proposed subcontract, obtaining DOE consent was a requirement for any subcontract between MSA and LMSI.

75.    The Mission Support Contract required MSA to provide a File Summary Memorandum to facilitate DOE's evaluation of the request for consent.  The File Summary Memorandum prepared by Defendants constituted and contained information "other than cost or pricing data" provided to DOE in support of the request for consent.  In the File Summary Memorandum, MSA falsely represented to DOE that LMSI was offering commercial services which LMSI also offered on its GSA Federal Supply Schedule.  MSA falsely represented that "LMSI offered an additional 4 percent discount on its GSA schedule rates" for Labor Hour/Time and Materials prices and that LMSI "established its Firm Fixed Price and Fixed Unit Rate prices by estimating the total hours and materials required to support the full scope of

work and applying their Federal Supply Schedule contract rates to this estimate." As discussed above, LMSI's labor rates not only did not represent discounted GSA labor rates, but represented rates that were grossly inflated both from LMSI's current published rates and from the rates that LMSI had proposed to, and was seeking from, GSA going forward. Moreover, contrary to the representation that all proposed services and items were commercially available, many of the labor categories and all of the materials set forth in the LMSI proposal were not even contained in the LMSI GSA Schedule.

76. Despite MSA's false representation to DOE that LMSI's proposal reflected items that were commercially available on LMSI's GSA schedule contract, LMSI's Contract 4863G did not actually include any rates for materials. Moreover, despite MSA's false representations, LMSI's proposal did not use the fixed unit rates that it had available on its Contract 4863G, but instead created its own improperly inflated fixed unit rates that were much higher and that were unique to the Hanford site. Additionally, contrary to MSA's false representation, LMSI's proposal did not reflect a 4 percent discount from its Contract 4863G rates, and did not reflect a discount at all from any LMSI current published or approved rate, but instead contained inflated rates.

77. In March 2010, MSA met with and provided a presentation to DOE regarding the LMSI consent request and proposed subcontract. MSA CFO and LMC employee Rich Olsen and MSA subcontracts manager Rich Meyer took the lead in preparing the presentation which falsely stated that: (1) "all pricing" from the LMSI proposal was "per GSA Federal Supply Schedule 70"; (2) "the fixed unit rates and fixed labor rates are based off the GSA Federal Supply Schedule"; and that (3) "LMSI discounted GSA schedule an additional 4%". None of these statements were true because: (1) none of the items or fixed unit rates proposed by LMSI were based on its GSA schedule; (2) rather than use the fixed unit rates from its GSA schedule, LMSI had created its own inflated fixed unit rates unique to the Hanford subcontract; and (3)

UNITED STATES' COMPLAINT - 24

rather than discounting its approved GSA schedule rates, LMSI grossly inflated, beyond even its GSA prices, the rates proposed to MSA.

78.     In April 2010, LMC, LMSI, and MSA executives, including Armijo, were again updated that GSA had not agreed to any increase in LMSI's GSA rates and that, therefore, the inflated rates used by LMSI in its proposal did not match LMSI's then-current published GSA rates, which, as Defendants knew, had not been escalated or increased since 2007.

79.     In May 2010, with DOE still asserting that it would not allow *any* additional profit for LMSI on the proposed subcontract with MSA, MSA CFO and LMC employee Richard Olsen emailed LMC executives Richard Bott and Martin Stanislav regarding LMSI's anticipated profitability on the very same subcontract, stating: "LM projected $33.3M for 10 years" and that LMC, LMSI, and MSA had "not provided this information to DOE."  Olsen further informed them that LMSI's profit was actually exceeding these projections in 2010, stating that the "current outlook for 2010 for the LM subcontract is $3.6M or $300k/month."

80.     In or about late May of 2010, Frank Armijo returned to MSA after serving a few months with LMC at LMC headquarters in Maryland as part of his career development plan as an LMC executive beginning in January 2010.  Armijo, who had previously served as MSA's Vice President of Information Technology while also maintaining his active role as an LMC executive responsible for LMSI's subcontract performance, returned in May 2010 as MSA's President, but continued to maintain his LMC role.  When Armijo returned to MSA, LMC explicitly charged him with ensuring that LMSI was able to recognize fee on its subcontract by the end of 2010, as set forth in a contracting strategy document circulated on May 28, 2010.

81.     Armijo directly reinserted himself into MSA's effort to obtain DOE consent to the proposed subcontract with LMSI, and immediately began taking actions to ensure that MSA's actions served LMC's bottom line.  As he explicitly stated to his LMC superiors, he was willing to ensure that MSA took whatever action was best for,

UNITED STATES' COMPLAINT - 25

or needed by, LMC, notwithstanding his role as President of MSA, a company that was supposedly in the process of negotiating subcontract terms and pricing with LMC's affiliate LMSI.  For example, in an email to his LMC superiors dated September 26, 2012, Armijo explained that when it came to carrying out his MSA position, he was "happy to do whatever [LMC] needs for 2012."

82.    Shortly after rejoining MSA as President, Armijo was once again explicitly informed that GSA had still not agreed to any consolidation of LMSI's GSA labor rates.  Consequently, as Armijo had been explicitly advised, LMSI's labor rates remained the same, and were far lower than the inflated rates that had been proposed to MSA and included in MSA and LMSI's request for consent from DOE, based on the false representations from MSA and LMSI that the pricing represented a 4 percent discount from LMSI's GSA schedule pricing.  As Armijo explained in a June 17, 2010 email to LMC officials, "I may lose business and more importantly lose EBIT," *i.e.,* profit, due to GSA's refusal to agree to any increase in LMSI's labor rates.

83.    In July 2010, DOE *again* explicitly told MSA, which in turn advised LMSI and LMC, that DOE would not agree to any additional profit for LMSI in the subcontract.  In a July 15, 2010 email to Olsen recounting a meeting with DOE contracting officials, MSA subcontract manager Rich Meyer explained that "[DOE] is very concerned and focused on the fact that LMSI is an affiliate of MSA and therefore not entitled to earn fee."  Meyer further explained part of the rationale for DOE's position was that in awarding the contract to MSA and responding to arguments made by unsuccessful bidders that MSA's price would undoubtedly increase because MSA would award a profit-bearing subcontract to LMSI, DOE took an explicit position that it would not allow any additional profit to LMSI on any such subcontract because MSA and LMSI were affiliates and because LMC was already earning profit on that work through its ownership of MSA, so the contract would not permit any additional profit for LMSI on any subcontract.  As Meyer explained, "[DOE] made an adjustment to the MSA proposed price when evaluating the proposal under the

competition for the Mission Support Contract to remove what they felt was the LMSI fee . . . [DOE Contracting Officer] Alan [Hopko] is not sure how he would ever be able to submit to HQ a package that reflects LMSI fee in it . . .”

84.    Knowing that DOE had consistently advised Defendants that it would not permit LMSI or LMC to earn any additional profit on a subcontract with MSA, Armijo sought to convince DOE, through a series of additional false statements, fraudulent half-truths, and outright lies, that the proposed subcontract did not include additional profit for LMSI.  For example, on August 26, 2010, he emailed DOE contracting official Douglas Aoyama explaining that, in its evaluation of the original LMSI subcontract proposal, the DCAA miscalculated the potential profit for LMSI, and that a more accurate calculation of the additional profit was 8.13 percent.  Armijo then told Aoyama that “then MSA negotiated with LMSI an additional discount of 4% which would reduce any potential fee even more.”

85.    Armijo’s statement was completely and patently false.  First, MSA had not “negotiated” anything with LMSI.  Armijo was the decision-maker on both sides of this “negotiation.”  Armijo, acting in the interests of LMC and LMSI, decided on behalf of MSA that the purported 4 percent discount would be accepted, after Armijo was also involved in determining, on behalf of LMSI, that it would be offered.  Second, LMSI’s proposed prices did not, in any way, reflect a 4 percent discount, or any kind of discount, from its GSA schedule pricing.  Instead, LMSI, LMC, and MSA grossly inflated the labor rates proposed to MSA.  Third, Armijo’s email to Aoyama suggested that any additional profit to LMSI would be in the low single digits, and significantly less than 8.13 percent.   In fact, as Armijo knew, and had been explicitly informed time and time again, LMC’s actual projection of LMSI’s additional profit on the subcontract was well above 10 percent, and LMSI and LMC had already determined that LMSI could provide a 10 percent discount from its GSA schedule prices and still earn an additional profit of 10 percent.

86.    Armijo, MSA, LMSI, and LMC knew that DOE had refused to allow LMSI or LMC to earn *any* additional profit on a subcontract with MSA.  Armijo, MSA, LMSI, and LMC also knew that LMSI's actual anticipated additional profit was above 10 percent and $30 million (for the first five years) and that LMSI's proposed prices did not represent a 4 percent discount from LMSI's GSA schedule prices but instead were inflated GSA prices.  Armijo, however, had been specifically tasked by LMC to obtain additional LMC and LMSI profit on the subcontract by using his role as MSA President to convince DOE to consent to the subcontract as proposed.  Armijo, MSA, LMC, and LMSI therefore knowingly misrepresented to DOE: (1) LMSI's estimated additional profit to be earned on the subcontract; (2) that LMSI's proposed prices reflected offerings from LMSI's GSA schedule contract; (3) that LMSI's proposed prices represented a 4 percent discount off LMSI's GSA schedule prices; and (4) that this 4 percent discount had been negotiated between MSA and LMSI in order to provide DOE with the lowest and most reasonable possible price, and to reduce unallowable and unreasonable additional profit to LMSI.

87.    On September 15, 2010, LMC executive David Valore emailed LMC employee Rich Olsen, who was also simultaneously serving as MSA's CFO, with updated projections regarding LMSI's anticipated additional profit from the subcontract.  These projections confirmed that LMSI was already earning over 10 percent in additional profit for FY 2010, which was nearly completed as of September 15, 2010, and projected approximately 11.5 percent in additional profit over the first five years of the LMSI subcontract.  Valore's email stated that he had "just got off the phone [with] Armijo, Willers, and [LMC employee Frank] Mcintyre, who had told [LMC executives Richard] Bott and [John] Mengucci the plan going forward" in preparation for submission of the LMSI best and final offer and discussions with DOE.  Between September 15 and 18, 2010, Armijo, Bott, Valore, Olsen, and others discussed LMC's pricing strategy and provided projections that showed over $37 million in additional profit projected for LMSI and LMC through the 5-year

subcontract, over and above the approximately $60 million in profit that LMC was to earn through ownership of MSA and its performance of the prime contract, including on the very same work that LMSI was to perform.  Through these and other communications, MSA, LMC, LMSI, Olsen, Armijo, and others were all aware of the estimated additional profit to accrue to LMSI and LMC via the proposed subcontract.

88.    On September 22, 2010, LMC employee Vince Leung emailed Olsen, as well as LMC employees Michael Mitrione, Robert Robertson, and Connie Varriale, to update them regarding the current status of discussions regarding the proposed LMSI subcontract.  As Mr. Leung's email made clear, based on discussions with Olsen and others, LMC, MSA, and LMSI understood that "[t]here may be risk associated with MSA being an affiliated company which may prohibit fee on fee for the LMSI IT services."  Consequently, while LMSI was projecting approximately 11.5 percent and $37.4 million in additional profit for LMC on the proposed subcontract, LMC, MSA, LMSI, Olsen, and Armijo also understood that this amount was at risk because DOE had explicitly stated that it would not permit additional LMSI subcontract for LMC, and that it would therefore be necessary to have DOE consent to the subcontract as proposed before any of this profit could be realized by LMC.

89.    In October 2010, LMSI prepared for MSA to submit to DOE a Best and Final Offer (BAFO) for its proposal for the MSA IR/CM work scope subcontract.  As a part of the revised offer, LMSI falsely stated that it was offering a 7.1 percent discount from its GSA schedule labor rate prices set forth in Contract 4863G.  LMSI also revised certain portions of the proposed work from time and materials cost estimates to fixed price estimates.  As set forth above and below in greater detail, however, regardless of the vehicle, all of the estimates and prices proposed by LMSI were improperly and falsely inflated.

90.    LMC internally reviewed and approved the October 2010 BAFO prior to submitting it.  The internal review noted that the total estimated revenue for the BAFO for the periods of FY 2011 – FY 2014 was $184,957,749 and the estimated

profit for FY 2011-FY 2014 was $27,809,733 or approximately 11.44 percent.  This did not include the millions of dollars in additional profit that, as MSA, LMC, LMSI, and Armijo knew, LMSI had already earned for 2010.  The LMC review noted that the profit estimates "are conservative based on historical performance evidence."  LMC provided this information to Rich Olsen, MSA Chief Financial Officer, and Frank Armijo, MSA President, who were also actively working in their roles at LMC at the time.

91.    LMSI's BAFO contained a number of knowingly false statements.  First, the BAFO falsely represented that "all pricing is based on discounts from LMSI published rates under its GSA Contract No. GS-35F-4863G.  The current schedule has been extended to 12/31/2010."  As MSA, LMC, LMSI, and Armijo knew, none of the materials proposed by LMSI were on Contract 4863G, nor any LMSI GSA contract.  Moreover, none of the pricing was based on a discount from Contract 4863G; instead, the proposed pricing represented inflated amounts from the current published GSA prices.

92.    Second, the BAFO falsely represented that "[t]he labor rates are based on a 7.13% discount from our GSA Schedule 70 contract."  Again, not only did the labor rates in LMSI's BAFO not represent a 7.13 percent discount, they actually represented an increase from LMSI's GSA schedule prices.  For example, LMSI's BAFO proposed a rate for the Software Engineer position of $66.94/hour for 2010.  As LMSI and MSA knew, LMSI's then-current published GSA rate for 2010 for Software Engineer was $61.43/hour.  Not only did LMSI's proposal not represent a 7.13 percent discount, it represented a *9 percent inflation* of LMSI's current, published GSA rate.  Moreover, as MSA and LMSI knew, at the time of the BAFO's submission, LMSI was actually seeking a significant *decrease* of this labor category due to falling labor costs, and had proposed to GSA to decrease the rate for this position to $52.28/hour for its GSA schedule contracts going forward, a decrease to

which GSA agreed on October 26, 2010, meaning that LMSI's labor rates were even further inflated when compared to these rates.

93.    Finally, the BAFO claimed that "LMSI's rates and this proposal are based on the commercial rates in LMSI's Schedule 70 contract.  GSA has already determined that LMSI's rates are fair and reasonable."  In fact, GSA *never* determined the rates proposed by LMSI to be reasonable, nor were the rates offered by LMSI "commercial" rates.  Quite the contrary.  GSA had negotiated far better prices than those which LMSI was proposing to MSA.

94.    LMSI's proposed rates to MSA were particularly unreasonable in light of the letter of supply that MSA had received authorizing MSA to purchase LMSI's services directly off Contract 4863G at no more than the prices set forth in Contract 4863G, meaning that MSA already had the right to purchase LMSI's services for far less than what LMSI was now "offering".  Moreover, GSA contracts, on their face, explicitly contemplate that a purchaser to negotiate for better pricing when placing a large order.  LMSI's Contract 4863G prices were determined to be fair and reasonable for a quantity of one hour, while LMSI was proposing a $184 million subcontract, making LMSI's proposal to MSA even more unreasonable.

95.    Again, the 7.13 percent "discount" did not represent any kind of arm's-length negotiation between MSA and LMC or LMSI.  Rather, Armijo had established the pricing on his own – deciding on behalf of LMC and LMSI what rates to offer, and deciding on behalf of MSA what MSA would accept, and charge to DOE.

96.    Moreover, as with its earlier proposals, LMSI's October 2010 BAFO contained false and grossly inflated fixed unit rates based on knowingly inflated FTE estimates used to build up the LMSI fixed unit rates proposed to be charged to DOE throughout the life of the MSA contract.  These fixed unit rates were grossly inflated because in calculating them, LMSI and LMC knowingly used false and inflated FTE estimates that were far in excess of LMSI's actual FTE estimates that it internally budgeted.  For example, for 2011, for the LMSI fixed unit rates proposed and charged

to MSA (and therefore DOE) for "network services," Defendants knowingly and falsely inflated the fixed unit rate by using 70.70 FTEs to calculate the fixed unit rate for 2011, resulting in a unit rate of $136.61/user and a total proposed FTE cost of $9,956,994 based on the over 10,000 estimated users.  Defendants knew, however, that LMSI's contemporaneous actual budget estimated only 46.40 FTEs for 2011, resulting in a budgeted FTE cost of $5,090,970, which translated to a budgeted unit rate of $103.74/user for that year.  Defendants therefore knowingly inflated the 2011 FTE cost for the network services FTE by nearly 100 percent, resulting in over 30 percent inflation of the unit rate falsely charged to DOE for each of over 10,000 Hanford site users for 2011, and resulting in DOE overpaying millions of dollars.

97.    Similarly, by way of example, for its Fixed Unit Rate proposed and charged to MSA for "user services," Defendants LMC and LMSI knowingly and falsely inflated the fixed unit rate by using 32.85 FTEs to calculate the fixed unit rate for 2011, resulting in a unit rate of $38.69/user and a total proposal FTE cost of $4,176,718 based on the estimated nearly 10,000 users for that year.  LMC and LMSI knew however, that LMSI's contemporaneous actual budget estimated only 21 FTEs for 2011, resulting in a budgeted FTE cost of $1,778,765.42 and a budgeted unit rate of $18.23 user.  LMC and LMSI therefore knowingly inflated the FTE cost for the user services FTE by over 100 percent, resulting in over 100 percent inflation of the unit rate falsely charged to DOE for each of over 10,000 Hanford site users in 2011, and resulting in DOE overpaying millions of dollars.  Defendants LMC, LMSI, MSA, and Armijo knowingly provided and used these and other false and inflated FTE estimates to DOE as part of the October 2010 BAFO, and they constituted information "other than cost or pricing data" relied upon by DOE in assessing the request for consent.

98.    LMC and LMSI similarly used and submitted false and inflated FTE estimates in support of certain of the fixed price services.  By way of example only, the October 2010 BAFO contained a false and inflated estimate of 17.7 FTE in

support of the fixed price for database management services for 2011. This estimate constituted information "other than cost or pricing data" submitted to and relied upon by DOE in assessing the request for consent. LMSI and LMC's actual estimate, as reflected by their contemporaneous internal estimate not shared with DOE, was 13 FTE, resulting in nearly a 40 percent inflation of LMSI's labor cost for database management, and DOE overpaying millions of dollars as a result of the false and inflated prices and claims that Defendants MSA, LMSI, LMC, and Armijo knowingly provided to DOE in 2011 alone.

99.     In addition to including inflated FTE estimates in the unit rates and firm fixed prices, LMSI also inflated its fixed unit rates and firm fixed prices by improperly and falsely including amounts for its use of "bargaining unit", *i.e.,* Hanford Atomic Metal Trades Council (HAMTC) labor for which MSA contracted, despite the fact that MSA also fraudulently claimed and recovered the costs for these services directly from DOE, resulting in DOE being billed twice for the same labor, once by MSA and once by LMSI as part of its firm fixed price or fixed unit rate.

100.     LMSI further inflated its firm fixed price and fixed unit rates by falsely and improperly including costs for site services that were not even included in the IR/CM statement of work that LMSI was designated to perform, as well as for site services that were not even provided by LMSI but rather a separate prime contractor. As with its double billing of HAMTC labor, LMSI's false and fraudulent inflation of its fixed unit rates and firm fixed prices by these amounts not only falsely inflated LMSI's rates, but resulted in DOE paying for these same costs twice, once to the site contractor that was actually performing and was intended to perform these services, and once to LMSI as part of its inflated fixed unit rates and firm fixed prices.

101.     As with LMSI's prior proposals, the October 2010 BAFO did not set forth the amount of any labor rates, but merely falsely represented that the prices were based on discounted GSA rates. As with the prior proposals from LMSI, again, at Campisi's request, LMC's Christine Barker provided a subsequent document setting

forth the proposed rates.  As with the prior rate file, based on the information that MSA, LMC, LMSI, and Armijo had received from Chesko regarding LMSI's then-current, published rates, which they had just been informed had been extended through December 2010, MSA, LMC, LMSI, and Armijo knew that the proposed rates did not reflect discounted GSA rates at all, but grossly inflated rates.

102.    MSA prepared a revised consent request to DOE incorporating and attaching the October 2010 BAFO and all of its false statements.  Meyer, Olsen, and Armijo were among those who took the lead in preparing the letter to DOE requesting consent and accompanying documentation.

103.    MSA's letter requesting consent, sent to DOE on November 2, 2010, contained numerous knowingly false statements that were material to DOE's evaluation of MSA and LMSI's request for consent to the subcontract.  Like the January 2010 File Summary Memorandum, this letter prepared by Defendants contained and constituted information "other than cost or pricing data" intended to be relied upon by DOE in evaluating the request for consent.

104.    For example, despite MSA's knowledge that LMSI's proposed prices were based on inflated – not discounted – GSA schedule prices, MSA's consent request letter falsely represented to DOE that "LMSI established its Firm Fixed Price and Fixed Unit Rate price by applying its [GSA] FSS rates to an estimate of a the total hours and materials required for this scope of work.  Also, LMSI based its Labor Hour/Time and Material prices directly on its GSA FSS rates – adding an additional 7.1 percent discount."

105.    MSA's consent letter falsely claimed that, with respect to the labor rates proposed by LMSI, "LMSI based these rates on the already determined fair and reasonable GSA contract rates and then discount them further."  In fact, LMSI's proposed rates represented inflated – not discounted – GSA contract prices that GSA had never determined to be fair or reasonable.  Similarly, MSA's letter reiterated, falsely, that "GSA has already determined fair and reasonableness of the pricing that

serves as the basis for LMSI's proposed price." None of the materials proposed by LMSI were on LMSI's GSA schedule at all. With respect to the fixed unit rates proposed by LMSI, LMSI had, but did not use, its GSA rates, but instead derived new fixed unit rates unique to Hanford that were based on false and inflated FTE estimates. Finally, with respect to the labor rates for services that did match services on LMSI's GSA schedule contract, GSA never determined the rates proposed by LMSI to be fair and reasonable, because they represented inflated prices grossly in excess of LMSI's GSA schedule prices.

106. MSA's consent letter also falsely claimed that "[a]s allowed and encouraged under the GSA Federal Schedule, MSA sought a price reduction of additional discounts that reflects best value" from LMSI's GSA schedule prices. In actuality, MSA, LMC, LMSI, and Armijo had agreed to *increase* LMSI's GSA schedule prices, and then to pass on LMSI's grossly inflated and unreasonable prices on to the DOE by falsely representing them to be discounted. Not only were these prices not the "best value" or the product of any arm's-length negotiation, but MSA already had received the legal authority to purchase LMSI's services for less than what LMSI was proposing – by placing orders for those services directly off LMSI's GSA schedule.

107. MSA's consent letter further falsely represented the extent of the additional profit anticipated by LMSI. MSA, LMSI, LMC, and Armijo knew that DOE had expressly stated that it would not permit any additional profit for LMSI on the subcontract, and had taken the position that LMSI's proposed subcontract should not bear any additional profit beyond that already earned by LMC on LMSI's IR/CM work through MSA's performance of the prime contract and LMC's part ownership of MSA. MSA, LMSI, LMC, and Armijo also knew that LMC was projecting, at a minimum, tens of millions of dollars and well above 10 percent in additional profit on the subcontract, and had already earned millions of dollars (in fact, exceeding these projections) on the work already performed and billed in 2010.

UNITED STATES' COMPLAINT - 35

108.    MSA's consent letter nonetheless falsely stated that "relative to the fee amount . . . MSA did not solicit cost details.  Therefore MSA does not have a specific LMSI proposed fee figure."  In fact, MSA, through Armijo, Olsen, and others, knew precisely the amount of additional fee/profit LMC was estimating on the proposed LMSI subcontract.

109.    To compound these lies, MSA's consent letter went on to falsely state to DOE that although it did "not have a specific LMSI proposed fee figure," it had calculated an "estimated net profit potential" for LMSI's additional profit to be 1 percent, and that it would impose a 1 percent penalty on LMSI if it did not adequately perform, such that "all of [LMSI's] remaining fee was at risk" based on LMSI's performance.  As Armijo, LMC, LMSI, and MSA knew, this was completely false. MSA did not need to "estimate" LMSI's net profit potential at all – it had specific and contemporary information regarding precisely what additional LMSI profit LMC was estimating and could earn.   Additionally, MSA, LMC, LMSI, and Armijo knew that they were anticipating, at a minimum, 11.5 percent -- not 1 percent -- in additional profit for LMSI on the subcontract.  Finally, MSA, LMC, LMSI, and Armijo knew that the overwhelming majority of this anticipated additional profit was not dependent in any way on LMSI's good performance, but was built into the false and inflated labor rates and fixed unit rates and fixed prices proposed to MSA.

110.    MSA's consent letter also included a table – drafted by Armijo, Olsen, and MSA employee Elizabeth Lugo – that set forth the "highlights" of the consent package.  As with the text of the letter, the table drafted by Armijo, Olsen, and Lugo, and inserted into the consent letter falsely set forth that LMSI's "estimated net profit potential" on the subcontract was "1%", and falsely claimed that the pricing represented a "7.1% negotiated discount from GSA labor rate schedule".

111.    Defendants' request for consent also included numerous other false statements and documents.  For example, the request for consent attached a Case File Memorandum, required under the Mission Support Contract, purporting to set forth

MSA's evaluation of the October 2010 BAFO and basis for MSA's conclusion, also set forth in the Case File Memorandum, that the pricing set forth in the October 2010 BAFO was fair and reasonable. This Case File Memorandum contained a number of knowing false statements, misrepresentations, omissions, half-truths, and outright lies. For example, with regard to the fixed unit rate and fixed price items, the Case File Memorandum falsely stated that "LMSI offers these same services to other customers in substantial quantities in the commercial marketplace based on catalog or market prices under commercial terms and conditions. Importantly, LMSI offers these same services on its GSA Federal Supply Schedule." In fact, the October 2010 BAFO expressly ***did not*** use the fixed unit rate pricing set forth in LMSI's GSA contracts, but created unique Hanford fixed unit rate pricing based on its false and inflated estimates, as set forth above.

112. Additionally, the Case File Memorandum submitted by MSA falsely stated:

> LMSI based its Labor Hour/Time and Material prices for this proposal on its current IT 70 GSA labor rate schedule. Further, MSA requested and LMSI offered an additional 7.13 percent discount on its GSA schedule rates.

None of these statements were true. As MSA, LMC, LMSI, and Armijo knew, LMSI's labor rates represented grossly inflated – not discounted – prices as compared to LMSI's GSA schedule prices. The File Summary Memorandum also similarly falsely stated that "MSA verified that the LMSI BAFO proposed rates were based on LMSI's current IT 70 GSA Federal Supply Schedule Contract." MSA "verified" no such thing, and in fact, could not have verified that LMSI's rates represented a 7.13 discount from its GSA schedule pricing because, of course, they did not.

113. Finally, the Case File Memorandum submitted by MSA falsely stated that "MSA IT Management did a complete technical review" of the October 2010 BAFO and concluded that the FTE estimates and approach to the work was

UNITED STATES' COMPLAINT - 37

reasonable.  In fact, MSA did not perform any meaningful or independent technical review.  The one-page "technical evaluation" supposedly conducted by MSA was authored by Armijo.  In other words, the individual who was responsible for LMC and LMSI's proposal and who was specifically tasked by his LMC superiors with obtaining the greatest possible profit for LMC and LMSI was also the individual tasked by MSA to review the proposal for technical sufficiency.  Perhaps due to this blatant conflict of interest, Armijo's one-page technical evaluation concluded, with no supporting evidence whatsoever, that the proposed FTE estimates were sufficient and reasonable.  In fact, LMSI and LMC had proposed false and grossly inflated FTE estimates, far in excess of what LMSI and LMC were actually estimating, and far in excess of what Armijo, who had been responsible for overseeing this work for years while LMSI was performing the same services for the predecessor contractor at Hanford, knew would reasonably be required to perform the work.  As with all of the false and fraudulent statements knowingly provided and used by Defendants, Defendants knowingly misrepresented these critical facts and used these inflated estimates to increase LMSI and LMC's profit, at DOE's expense.

114.   DOE responded to the consent request on February 1, 2011.  DOE's response explicitly stated that "no affiliate fee will be allowed," and that, therefore, it would not permit even the 1 percent profit that MSA, LMSI, LMC, and Armijo had falsely represented that LMSI was estimating, because it would not permit any additional profit for LMSI at all.  DOE's response therefore required that MSA "remov[e] the proposed 1 percent affiliate fee" in order for DOE's consent to the subcontract to be granted.

115.   DOE's response to the consent letter provided conditional consent to the subcontract, contingent on Defendants' removing the additional LMSI profit, which, based on Defendants' false statements and lies, DOE believed to be 1 percent.  DOE's conditional consent was obtained through Defendants MSA, LMC, LMSI, and Armijo's many false statements, outright lies, and knowing half-truths and omissions.

UNITED STATES' COMPLAINT - 38

DOE's conditional consent also made explicitly clear that DOE had not concluded that any of LMSI's costs were allowable or reasonable under the contract, which under the Mission Support Contract and the Federal Acquisition Regulation remain the responsibility of the prime contractor to establish and demonstrate.

116.   MSA recognized DOE's response for what it was.  As Meyer explained to Olsen right after receiving it, "I do not see it as good news at all . . . it rejects/does not allow any affiliate fee."  However, rather than carry out DOE's wishes by removing the proposed profit, which would have required LMSI to eliminate its gross inflation of its labor rates, fixed unit rates, and fixed prices, MSA, LMSI, LMC, and Armijo agreed to reduce LMSI's proposed labor rates by 1 percent – falsely and knowingly failing to disclose that its many prior false statements had led DOE to believe that the additional profit for LMSI had been 1 percent, and not the, at a minimum, 11.5 percent actually estimated by LMSI, LMC, MSA, and Armijo, and falsely and knowingly failing to disclose that this very high level of expected profit was due to the significant inflation of LMSI's labor rates, fixed unit rates, and fixed prices as set forth in LMSI's proposal.

117.   MSA, LMSI, LMC, and Armijo's false statements, knowing half-truths, misleading statements and omissions, and outright lies caused LMSI's inflated prices to be charged to DOE – through MSA, LMC's affiliate and willing accomplice.  MSA knowingly charged these false and inflated rates to DOE for the entirety of LMSI's subcontract in each and every claim that LMSI submitted to MSA under the subcontract and in each and every claim that MSA made to DOE for LMSI's grossly inflated labor rates, fixed unit rates, and firm fixed prices.

## VI.    DEFENDANTS' USE OF KICKBACKS TO IMPROPERLY OBTAIN AND REWARD FAVORABLE TREATMENT FOR LMSI AND LMC WITH REGARD TO THE SUBCONTRACT

118.    LMC used its Management Incentive Compensation Program (MICP) to provide things of value to high-ranking MSA employees, including Armijo and Olsen, for their use of their MSA positions to provide favorable treatment to LMC and LMSI.

119.    For example, for 2009-2015, in addition to his MSA salary, Olsen received $461,700 in cash through LMC's MICP in return for improperly using his MSA position to provide LMC and LMSI with favorable treatment (in the form of unallowable and unreasonable additional profit for LMSI) with respect to LMSI's subcontract with MSA.

120.    In 2011 alone, the year in which Olsen used his MSA position to convince DOE, through the false statements and fraudulent conduct described above, to provide conditional consent to the MSA-LMSI subcontract based on false information, LMC paid Olsen $53,800 in cash based on Olsen's own description of his significant accomplishments made to LMC.  Olsen's MICP description for that year stated that, for Olsen:

> The major accomplishment this past year was negotiating with DOE the acceptance of the "commercial type" subcontract for Lockheed Martin.  This took several months of discussions, presentations and documentation requested by DOE.  This successful negotiation has resulted in recognition of $17M of EBIT [profit] for LM in 2011 and is expected to double the business case commitment for the life of the MSA contract.

As Olsen later acknowledged, this remuneration was specifically for Olsen providing LMC and LMSI with favorable treatment through use of his MSA position and relative to the subcontract, and not for any benefit that he conferred on MSA.  This was in addition to Olsen's MSA salary.

121.    Similarly, from 2009-2015, in addition to his MSA salary, Armijo received an additional $2,089,374, of which $461,800 was in cash and the remainder

in LMC stock and other compensation, through LMC's MICP in return for improperly using his MSA position to provide LMC and LMSI with favorable treatment (in the form of unallowable and unreasonable additional profit for LMSI) with respect to LMSI's subcontract with MSA.

122.    For 2011 alone, the year in which Armijo used his MSA position to convince DOE, through the false statements and fraudulent conduct described above, to provide conditional consent to the MSA-LMSI subcontract based on false information, LMC paid Armijo $193,422 in total incentive compensation, including $33,200 in cash, in addition to his $267,000 MSA salary for that year.  Armijo's own MICP description of his accomplishments provided to LMC for that year stated that Armijo "Achieved commerciality on the LM Subcontract to MSA which will deliver in excess of $100 million in EBIT [profit] thru the 10-year life of the program."

123.    Between 2009 and 2015, LMC provided millions of dollars in additional compensation to MSA employees, including Olsen, Armijo, Todd Eckman, and David Ruscitto, in return for using their MSA positions to enhance LMSI and LMC's bottom line through the LMSI subcontract to MSA.  Defendants did not inform DOE of LMC's additional payments to these supposed MSA employees, nor did they inform DOE that these additional payments were in return for using their MSA employment to provide benefit to LMC and LMSI.  These payments were kickbacks because they were payments by LMC and LMSI to employees of MSA, a prime contractor, in return for improperly providing LMC and LMSI with favorable treatment relative to the MSA-LMSI subcontract and MSA's contract with DOE.

## VII.    FALSE CLAIMS SUBMITTED AND CAUSED TO BE SUBMITTED BY DEFENDANTS

124.    LMSI submitted more than 15,000 invoices to MSA for IR/CM services pursuant to its subcontract with MSA between January 1, 2010 and when MSA, after having LMC's ownership interst purchased by another entity so that it was no longer an LMC affiliate, terminated LMSI's subcontract.  As set forth in more detail above,

as a result of Defendants' false and fraudulent representations and conduct, and DOE's reliance thereon, DOE was falsely and fraudulently induced to provide conditional consent for MSA's subcontract to LMSI.  DOE would not have provided its conditional consent if it had known the truth about Defendant's false and fraudulent representations and omissions.  Because DOE was fraudulently induced to provide conditional consent to MSA's subcontract to LMSI, each invoice submitted by LMSI to MSA, fully reimbursed by DOE through the cost-reimbursement Mission Support Contract, was a false and fraudulent claim.

125.    Additionally, the claims submitted by LMSI to MSA for the IR/CM services, and the corresponding claims that MSA submitted to DOE for full reimbursement of the amounts paid to LMSI, were false and fraudulent because they were improperly inflated and based on false estimates and other cost and pricing information provided and used by LMC and LMSI, because they included inflated, unallowable, and unreasonable profits to LMSI.

126.    Moreover, the claims submitted by LMSI to MSA for the IR/CM services, for which MSA was fully reimbursed by DOE pursuant to the Mission Support Contract, were false and fraudulent because they were inflated and tainted by kickbacks provided by LMC and LMSI to MSA and Armijo in return for favorable treatment for LMC and LMSI on the MSA-LMSI Subcontract, in violation of the Anti-Kickback Act, the False Claims Act, and the Mission Support Contract.  These false and fraudulent claims include, but are not limited to, the false claims submitted for work allegedly performed by Frank Armijo, Rich Olsen, and other purported MSA employees who, in reality, were working for the benefit of, and receiving kickbacks from, LMSI and LMC.

127.    By way of example only, Defendants' knowing use of false and fraudulent inflated FTE estimates , double-billed HAMTC labor, and other improper amounts in its unit rates and firm fixed prices for certain IR/CM task orders billed as fixed unit rate or firm fixed prices, as discussed above in paragraphs 61 and 96

through 100, resulted in the following false and fraudulent claims submitted by LMSI to MSA.  In addition to being false and fraudulent for the reasons discussed above in paragraphs 124 through 126, these claims were false and fraudulent because Defendants knowingly made and used false and inflated FTE estimates in creating these false and inflated fixed unit rates and firm fixed prices, and because they included false, unreasonable, and unallowable profit for LMSI.

Fixed Unit Rate Invoices:

| Invoice Date | Release # | Invoice # | Invoice Amount | Paid Date | Payment Reference # | WBS |
|---|---|---|---|---|---|---|
| 12/20/2010 | 39568-100 | THZ031185 | $6,011.93 | 02/01/2011 | 677577000000 | 3001.A9.01.08 |
| 03/30/2011 | 39568-101 | CHZ061191 | $439.74 | 04/28/2011 | 826897000000 | 3001.A9.01.08 |
| 01/25/2012 | 39568-525 | SHZ0412174 | $454,360.42 | 02/23/2012 | 901068000000 | 3001.A9.01.08 |
| 01/25/2012 | 43695-115 | SHZ0412156 | $512,431.35 | 02/23/2012 | 380068000000 | 3001.A9.01.08 |
| 04/22/2013 | 39568-825 | CHZ0713176 | $4,594.85 | 05/23/2013 | 781229000000 | 3001.A9.01.08 |
| 08/21/2014 | 39568-1136 | CHZ1114181 | $28,954.93 | 09/24/2014 | 905579000000 | 3001.A9.01.08 |
| 01/22/2015 | 39568-1472 | CHZ0415181 | $29,773.35 | 02/24/2015 | 112399000000 | |
| 05/21/2015 | 43695-318 | CHZ0815191 | $1,092.84 | 06/25/2015 | 785800100000 | |

Fixed Price Invoices:

| Invoice Date | Release # | Invoice # | Invoice Amount | Paid Date | Payment Reference # | WBS |
|---|---|---|---|---|---|---|
| 03/23/2010 | 39568-070 | 20571309 | $19,898.23 | 04/22/2010 | 570507000000 | 3001.03.03.04.01 |
| 06/19/2011 | 39568-071 | 20837473 | $306,011.17 | 07/20/2011 | 259618000000 | 3001.03.02.01.02 |
| 01/22/2012 | 39568-523 | 20972228 | $52,983.17 | 02/22/2012 | 251958000000 | 3001.03.03.03.02 |
| 09/22/2013 | 39568-827 | 21298978 | $13,416.63 | 03/05/2014 | 988359000000 | 3001.03.02.01.05 |
| 07/20/2014 | 39568-1095 | 21457141 | $251,500.00 | 08/21/2014 | 121179000000 | 3001.03.02.01.02 |
| 02/16/2015 | 39568A-1322 | 21572301 | $7,166.67 | 03/19/2015 | 572599000000 | |

128.    By way of example only, Defendants' false and fraudulent statements and representations concerning its GSA labor rates resulted in the following false and fraudulent claims submitted by LMSI to MSA for task orders billed on a time and materials basis.  These claims were additionally false and fraudulent because they were based on false and inflated labor rates provided by LMSI and MSA, and because they included false, unreasonable, and unallowable profit for LMSI:

| Invoice Date | Release # | Invoice # | Invoice Amount | Paid Date | Payment Reference # | WBS |
|---|---|---|---|---|---|---|
| 11/18/2010 | 39568-0038 | 20708061 | $39,904.87 | 12/16/2010 | 096567000000 | 3001.04.13.01.04 |
| 11/16/2011 | 39568-0514 | 20932804 | $20,729.07 | 12/15/2011 | 315948000000 | 3001.03.02.02.02 |
| 05/23/2012 | 39568-0642 | 21056395 | $58,082.44 | 06/21/2012 | 610878000000 | 3001.02.04.02.01 |
| 08/23/2013 | 39568-0909 | 21289515 | $5,797.65 | 09/25/2013 | 112739000000 | 3001.08.08.13.05 |
| 03/26/2014 | 39568-1119 | 21390183 | $10,386.76 | 04/24/2014 | 080959000000 | 3001.03.06.05.01 |
| 01/29/2015 | 39568-1345 | 21560719 | $479.40 | 02/26/2015 | 517399000000 | |
| 04/23/2015 | 43695-0364 | 21600558 | $1,503.42 | 05/21/2015 | 414400100000 | |

129.    For each false and inflated claim submitted by LMSI to MSA for IR/CM services under its subcontract with MSA, MSA submitted a corresponding false and inflated claim to DOE for reimbursement of the amount paid LMSI, plus additional amounts charged by MSA as prime contractor, by drawing down on the DOE line of credit that was available to MSA as the Mission Support Contractor, on or about about the same date that MSA paid LMSI.  Therefore, by way of example, on or about the "paid date" in the tables above, MSA submitted a false and fraudulent claim to DOE by drawing down on the DOE line of credit for the amount paid to LMSI, plus additional amounts charged by MSA as prime contractor, and using the payment reference numbers and work breakdown structure "WBS" designations above that corresponded to various items and billing categories in the Mission Support Contract.

UNITED STATES' COMPLAINT - 44

130.    LMSI also knowingly submitted, and caused to be submitted numerous claims that did not go through MSA.  LMSI used its same inflated labor rates accepted and used by MSA to falsely bill Washington River Protection Services (WRPS), another Hanford contractor for which LMSI provided IR/CM services, for time and materials task orders.  LMSI's basic ordering agreements with WRPS expressly provided that LMSI was to bill WRPS using the same pricing as set forth in the MSA-LMSI subcontract for which Defendants had fraudulently obtained DOE's conditional consent.  LMSI's claims to WRPS therefore were false and inflated, containing the same false and inflated LMSI labor rates, and the same false and inflated fixed unit rates and fixed prices that were based on Defendants' false and inflated FTE estimates.  WRPS then sought and received reimbursement from DOE through its own DOE-provided line of credit for each false and inflated claim submitted by WRPS.  By way of example only, Defendants submitted and caused to be submitted the below false claims for LMSI services provided to WRPS:

| Invoice Date | Invoice Type | Release # | Invoice # | Invoice Amount |
|---|---|---|---|---|
| 11/16/2010 | T&M | 16510-397 | 1606654 | $97,893.97 |
| 06/20/2011 | T&M | 16510-328 | 1607211 | $11,010.89 |
| 12/20/2012 | FUR | 49654-004 | RHZ0313162 | $9,507.75 |
| 02/18/2013 | T&M | 49653-037 | FEB13HR00037 | $4,907.84 |
| 05/19/2013 | FP | 49654-003 | 21252504 | $10,094.00 |
| 08/21/2014 | FUR | 49654-002 | SHZ1114157 | $518,180.78 |
| 01/29/2015 | T&M | 49653-118 | 21560852 | $11,732.81 |

131.    The examples set forth in paragraphs 127, 128, and 130 are merely examples of false claims submitted and caused to be submitted by Defendants.  Each and every claim submitted by LMSI to MSA and WRPS under its firm fixed price and

fixed unit rate task orders was false and fraudulent because it was based on Defendants' fraudulent inflation and conduct concerning its anticipated and estimated level of effort.  Similarly, each and every claim submitted by LMSI to MSA and WRPS under its time and materials task orders was false and fraudulent because it was based on Defendants' false and inflated labor rates and Defendants' fraudulent statements and conduct concerning the labor rates that LMSI was charging to MSA and WRPS.  Finally, each and every claim submitted by MSA to DOE for IR/CM services performed by LMSI was false and fraudulent because the claims were: (1) tainted by Defendants false and fraudulent conduct; (2) based on fraudulently-obtained DOE conditional consent, which DOE would not have provided had it known the truth; (3) based on false and inflated level of effort estimates from LMSI; (4) based on false and inflated labor rates charged by LMSI; and (5) tainted by kickbacks paid by LMSI and LMC for favorable treatment.  DOE would not have reimbursed MSA for any of the IR/CM services allegedly performed by LMSI if DOE had known the truth, or if DOE had not relied on Defendants' false statements and fraudulent conduct in providing conditional consent for the MSA-LMSI subcontract and in reimbursing MSA for LMSI's claims.

## COUNT I
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)
### (Against Defendants MSA, LMC, LMSI, and Armijo)

132.   The United States repeats and realleges the allegations contained in Paragraphs 1 through 131 above, as if fully set forth herein.

133.   Defendants MSA, LMC, LMSI, and Armijo violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and causing to be presented to the DOE false and/or fraudulent claims for payment on MSA's DOE contract and LMSI's subcontract with MSA.

134.   The United States paid the false and/or fraudulent claims because of MSA's, LMC's, LMSI's, and Armijo's acts, and incurred damages as a result.

135.   Pursuant to 31 U.S.C. § 3729(a), Defendants MSA, LMC, LMSI, and Armijo are each liable to the United States Government for a civil penalty for each violation of the False Claims Act committed by Defendants MSA, LMC, LMSI, and Armijo.

136.   Pursuant to 31 U.S.C. § 3929(a), Defendants MSA, LMC, LMSI, and Armijo are jointly and severally liable to the United States for three times the amounts of all damages sustained by the United States because of Defendants' conduct.

## COUNT II
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)
### (Against Defendants MSA, LMC, LMSI, and Armijo)

137.   The United States repeats and realleges the allegations contained in Paragraphs 1 through 136 above, as if fully set forth herein.

138.   Defendants MSA, LMC, LMSI, and Armijo violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, false records or statements that were material to false or fraudulent claims for payment to the DOE, and which claims the United States did pay.

139.   The United States paid the false and/or fraudulent claims because of MSA's, LMC's, LMSI's, and Armijo's acts, and incurred damages as a result.

140.   Pursuant to 31 U.S.C. § 3729(a), Defendants MSA, LMC, LMSI, and Armijo are each liable to the United States Government for a civil penalty for each violation of the False Claims Act committed by Defendants MSA, LMC, LMSI, and Armijo.

141.   Pursuant to 31 U.S.C. § 3929(a), Defendants MSA, LMC, LMSI, and Armijo are jointly and severally liable to the United States for three times the amounts of all damages sustained by the United States because of Defendants' conduct.

UNITED STATES' COMPLAINT - 47

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III
## For Civil Penalties Under 41 U.S.C. §§ 8702 and 8706
## (Against Defendants MSA, LMC, LMSI, and Armijo)

142.    The United States repeats and realleges the allegations contained in Paragraphs 1 through 141 above, as if fully set forth herein.

143.    Defendant MSA violated the Anti-Kickback Act, 41 U.S.C. § 8702, by knowingly soliciting and accepting kickbacks provided by LMSI and LMC to improperly reward MSA and to obtain favorable treatment from MSA in connection with LMSI's subcontract to MSA, and by knowingly including the amount of those kickbacks in contract prices charged by LMSI to MSA and by MSA to DOE.

144.    Defendant Armijo violated the Anti-Kickback Act, 41 U.S.C. § 8702, by knowingly soliciting and accepting kickbacks provided by LMSI and LMC to improperly reward Armijo and obtain favorable treatment from Armijo and MSA in connection with LMSI's subcontract to MSA.

145.    Defendants LMSI and LMC violated the Anti-Kickback Act, 41 U.S.C. § 8702, by knowingly offering and providing kickbacks to Defendants MSA and Armijo, and by knowingly including the amount of those kickbacks in contract prices charged by LMSI to MSA and by MSA to DOE, in order to improperly reward MSA and Armijo and obtain favorable treatment from MSA and Armijo in connection LMSI's subcontract to MSA.

146.    Pursuant to 41 U.S.C. § 8706, Defendants MSA, LMSI, LMC, and Armijo are each liable to the United States for a civil penalty in the amount of twice the amount of each kickback involved in each violation, plus an additional civil penalty per violation.

## COUNT IV
## For Breach of Contract
## (Against Defendant MSA)

147.    The United States repeats and realleges the allegations contained in paragraphs 1 through 146, as if fully set forth herein.

UNITED STATES' COMPLAINT - 48

148.    Without excuse, Defendant MSA materially breached its Mission Support Contract with the United States Department of Energy by: (1) charging inflated, unallowable, and unreasonable costs associated with LMSI's subcontract to MSA; (2) soliciting and accepting kickbacks from LMSI and LMC in return for improperly providing LMSI and LMC with favorable treatment with respect to LMSI's subcontract to MSA; (3) charging the Department of Energy for unreasonable and unallowable subcontractor fee in violation of contractual and regulatory provisions; and (4) billing the Department of Energy for purported MSA employees "seconded" from LMC and LMSI who, in fact, were working on behalf of LMC and LMSI and to the detriment of MSA and the Department of Energy.

**COUNT V**
**For Unjust Enrichment**
**(Against Defendants LMC, LMSI, and Armijo)**

149.    The United States repeats and realleges the allegations contained in paragraphs 1 through 148, as if fully set forth herein.

150.    By receiving inflated, unreasonable, and unallowable payments and profits from the United States Department of Energy, by making and using false records and statements, by soliciting, accepting, offering, and paying kickbacks, and engaging in conflicts of interest, and through its wrongful, improper, and corrupt conduct, Defendants LMC, LMSI, and Armijo have been unjustly enriched and are liable to repay such amounts to the United States.

**COUNT VI**
**For Payment by Mistake**
**(Against Defendant LMSI)**

151.    The United States repeats and realleges the allegations contained in paragraphs 1 through 150, as if fully set forth herein.

152.    As a result of its conduct, Defendant LMSI received payments from the Department of Energy to which they were not entitled and as a result of mistake of fact of the Department of Energy.

153.    The Department of Energy relied upon its mistake in authorizing and approving payment to LMSI.

154.    LMSI are liable to the United States for the amounts paid to LMSI by the United States as a result of this mistake.

## PRAYER FOR RELIEF

155.    Plaintiff the United States of America prays for judgment against the Defendants, as follows:

A.    As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against Defendants MSA, LMSI, LMC, and Armijo, for treble the amount of the United States' single damages to be proven at trial, plus civil penalties as are required by law per violation of the False Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.    As to Count III under the Anti-Kickback Act, 41 U.S.C. §§ 8702, 8706, against Defendants MSA, LMSI, LMC, and Armijo, civil penalties double the amount of the kickbacks, plus additional civil penalties per instance of prohibited conduct under the Anti-Kickback Act, and such other relief as may be necessary and proper;

C.    As to Count IV, breach of contract, against Defendant MSA, for the amount of damages sustained by the United States as a result of MSA's breaches of contract, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

D.    As to Count V, unjust enrichment, against Defendants LMSI, LMC, and Armijo, for the sums by which Defendants LMSI, LMC, and Armijo have been unjustly enriched, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

E.    As to Count VI, payment by mistake, against Defendant LMSI, for the amounts paid to LMSI by mistake, to be proven at trial, plus pre-judgment and post-judgment interest, and costs; and

F.      Such other relief as the Court deems just, necessary, and proper.

The United States demands a trial by jury as to all issues so triable.

Respectfully Submitted,

Joseph H. Harrington
United States Attorney

*/s/ Dan Fruchter*
Dan Fruchter
Tyler H.L. Tornabene
Assistant United States Attorneys
Eastern District of Washington
920 W. Riverside Ave., Suite 340
Spokane, Washington 99201
(509) 353-2767
Daniel.Fruchter@usdoj.gov

Joseph H. Hunt
Assistant Attorney General

*/s/ Alexandra N. Wilson*
Michael D. Granston
Sara McLean
Don Williamson
Alexandra N. Wilson
United States Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Dated: February 8, 2019

UNITED STATES' COMPLAINT - 51

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ Yes   ☐No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.