1  Geana M. Van Dessel, WSBA #35969
   KUTAK ROCK LLP
2  502 W. Riverside Ave., Suite 800
   Spokane, WA 99201
3  T: (509) 252-2691

4  Justin Shur, admitted *pro hac vice*
   Lucas Walker, admitted *pro hac vice*
5  Eric Nitz, admitted *pro hac vice*
   MOLOLAMKEN LLP
6  600 New Hampshire Ave., NW
   Washington, DC 20037
7  T: (202) 556-2000

8  Attorneys for Jorge Francisco "Frank" Armijo

9
                    **UNITED STATES DISTRICT COURT**
10                  **EASTERN DISTRICT OF WASHINGTON**

11  UNITED STATES OF AMERICA,
                                        Case No. 4:19-CV-5021-RMP
12                          Plaintiff,
                                        FRANK ARMIJO'S MOTION TO
13      v.                              DISMISS

14  MISSION SUPPORT ALLIANCE,           Hearing: October 3, 2019
    LLC, LOCKHEED MARTIN                With Oral Argument at 10:00 a.m.
15  SERVICES, INC., LOCKHEED
    MARTIN CORPORATION, and
16  JORGE FRANCISCO "FRANK"
    ARMIJO,
17
                          Defendants.
18

19

20

21

22

23

24
    FRANK ARMIJO'S MOTION TO DISMISS -i

                                            Kutak Rock LLP
                                        510 W. Riverside Ave., Suite 800
                                          Spokane, WA 99201-0506
                                        (509) 747-4040; fax (509) 747-4545

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................1

**BACKGROUND** ...................................................................................4

I.      Regulatory Background ...............................................................4

II.     Factual Background ....................................................................7

      A.      MSA is awarded the Mission Support Contract and retains
LMSI as the subcontractor for IR/CM services. ...................7

      B.      Frank Armijo is seconded to MSA.........................................7

      C.      MSA and LMSI propose terms for the LMSI subcontract...................9

      D.      DOE conditionally consents to the LMSI subcontract.......................11

      E.      Armijo participates in Lockheed Martin's Management
Incentive Compensation Program. .......................................12

**STANDARD OF REVIEW** ...................................................................13

**ARGUMENT** .......................................................................................14

I.      The Complaint fails to state an Anti-Kickback Act claim (Count III).........15

      A.      Compensation from one's employer cannot be a kickback. ..............15

          1.      *Skilling* forecloses the government's kickback theory. ...........15

          2.      Fair-notice and lenity concerns defeat the government's
kickback theory. ...................................................17

      B.      The Complaint fails to allege a plausible kickback claim. ...............20

          1.      The Complaint does not allege Armijo's incentive
compensation was in return for favorable treatment to
LMSI. .........................................................................20

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

2.    The Complaint does not allege Armijo acted improperly. ......22

II.    The Complaint fails to state a False Claims Act claim (Counts I & II). ......24

A.    The Complaint does not plausibly allege Armijo's participation in the alleged fraud. ..........................24

B.    The Complaint does not satisfy *Escobar*'s "demanding" materiality standard. ..........................27

C.    The Complaint does not allege Armijo acted knowingly. ................29

III.    The Complaint fails to state an unjust enrichment claim (Count V)............30

**CONCLUSION**..................................................31

FRANK ARMIJO'S MOTION TO DISMISS -iii

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

## **Table of Authorities**

<u>Cases</u>

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................. 13, 21, 25, 26

*Destfino v. Reiswig*, 630 F.3d 952 (9th Cir. 2011) ........................................... 24

*In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008) ......................... 14

*In re NovaGold Res., Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y.
    2009) ................................................................................................ 26

*Marder v. Lopez*, 450 F.3d 445 (9th Cir. 2006) ................................................... 22

*Mastaba, Inc. v. Lamb Weston Sales, Inc.*, 23 F. Supp. 3d 1283 (E.D.
    Wash. 2014) ..................................................................................... 30

*McFadden v. United States*, 135 S. Ct. 2298 (2015) ........................................... 20

*Morse Diesel Int'l, Inc. v. United States*, 66 Fed. Cl. 788 (2005) ........................ 16

*MSC Indus. Direct Co. v. United States*, 126 Fed. Cl. 525 (2016) ......................... 6

*Skilling v. United States*, 561 U.S. 358 (2010) .................................... 2, 15, 17, 18

*Swarts v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) .......................................... 24

*United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166
    (9th Cir. 2006) ......................................................................... 24, 29

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d
    366 (5th Cir. 2017) .............................................................. 17, 19, 20, 23

*United States v. Burger*, No. CR 99-0439 SI, 2000 WL 33910676,
    (N.D. Cal. June 6, 2000) ............................................................... 17, 18

*United States v. Granderson*, 511 U.S. 39 (1994) ............................................... 17

*United States v. Lanier*, 520 U.S. 259 (1997) .................................................... 17

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,

  136 S. Ct. 1989 (2016)..................................................27

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)..........................14

Statutes

31 U.S.C. §3729(a)(1)(A) ..........................................................14

31 U.S.C. §3729(a)(1)(B) ..........................................................14

31 U.S.C. §3729(b)(4)..............................................................27

41 U.S.C. §8701(2) .............................................................15, 22

41 U.S.C. §8702 .................................................................14, 19

41 U.S.C. §8706 .....................................................................14

41 U.S.C. §8706(a)(1)................................................................19

41 U.S.C. §8707 .....................................................................17

Regulations

48 C.F.R. §2.101 .....................................................................6

48 C.F.R. §15.402(a)..................................................................4

48 C.F.R. §15.403-1(b)..............................................................28

48 C.F.R. §15.403-1(b)(3) ............................................................6

48 C.F.R. §15.403-1(c)(3)............................................................6

48 C.F.R. §15.404-1(b)(1) ............................................................6

48 C.F.R. §15.404-1(b)(2) ............................................................6

48 C.F.R. §15.405(b) .................................................................6

48 C.F.R. §16.103(b) .................................................................5

48 C.F.R. §16.202-1...............................................................4, 5

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

48 C.F.R. §16.301-1 ........................................................................... 5

48 C.F.R. §16.302(a) .......................................................................... 5

48 C.F.R. §16.305 .............................................................................. 5

48 C.F.R. §16.601(b) .......................................................................... 5

48 C.F.R. §31.205-26(e) ..................................................................... 5

48 C.F.R. §31.205-26(e)(2) ........................................................... 6, 28

48 C.F.R. §31.205-26(f) ..................................................................... 6

<u>Rules</u>

Federal Rule of Civil Procedure 9(b) ................................................. 14

<u>Other Authorities</u>

W. Noel Keyes, *Government Contracts Under the Federal Acquisition*

　　*Regulation* (3d ed. 2018) .............................................................. 5

FRANK ARMIJO'S MOTION TO DISMISS -vi

Defendant Jorge Francisco "Frank" Armijo respectfully moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the United States of America's Complaint for failure to state a claim upon which relief can be granted.

## **INTRODUCTION**

For years, Lockheed Martin Services Inc. ("LMSI") provided essential information technology services for the Department of Energy's ("DOE") cleanup efforts at the Hanford Nuclear Site. LMSI first did so as a subcontractor to an unrelated company. It then continued to provide those same services after Mission Support Alliance ("MSA")—a joint venture that included Lockheed Martin—was awarded the prime contract. There is no allegation that the quality of the services was deficient in any way. Instead, the government complains that LMSI earned profits on its subcontract with MSA, even though the two companies were affiliated, and that defendants allegedly hid that fact from DOE.

That theory is fundamentally flawed. As the Complaint concedes, the defendants consistently took the position that LMSI's services were "commercial" services for which the governing contract and regulations expressly permitted LMSI to earn a profit, notwithstanding any affiliation between MSA and LMSI. The Complaint never alleges that the services did not qualify as commercial. The Complaint admits, moreover, that LMSI's subcontract was structured on a fixed-price basis. Such contracts *inherently* carry the potential for contractor profit—or loss. In fact, federal regulations encourage fixed-price contracts precisely because the prospect of profit encourages efficiency. DOE consented to the LMSI subcontract on that basis. DOE never insisted on a cost-reimbursement subcontract that

FRANK ARMIJO'S MOTION TO DISMISS -1

would have eliminated any possibility of profit. The government's complaints about the profitability of the subcontract thus fall flat.

The government's allegations are especially weak with respect to Frank Armijo, the sole individual defendant named in the Complaint. A longtime Lockheed Martin executive and IT professional, Armijo was twice "seconded" to MSA, first as its Vice President for information technology and later as its President. The Complaint accuses Armijo of using his authority at MSA to secure favorable (*i.e.*, profitable) subcontract terms for LMSI—and of receiving supposed "kickbacks" from Lockheed Martin in return. But what the Complaint labels "kickbacks" were in fact nothing more than ordinary incentive compensation Armijo received from his longtime employer under its established incentive-compensation program. The Supreme Court has squarely rejected the notion that "salary and bonuses" paid by one's employer can qualify as a "kickback." *Skilling v. United States*, 561 U.S. 358, 413 (2010). The Complaint defies that instruction.

The government's novel and unfounded "kickback" theory would, more-over, threaten devastating consequences for employees of government contractors. It is utterly common for employees like Armijo to be "seconded" to a joint venture or other affiliated company to carry out a government contract. But if those employees so much as ***mention*** that work to their primary employer in a self-evaluation for a single year, the government's theory would condemn ***all*** of their incentive compensation across multiple years as an illegal "kickback." That is not a wild hypothetical: It is exactly what the government attempts here. That approach would impose ruinous civil—and potentially criminal—liability on individuals

FRANK ARMIJO'S MOTION TO DISMISS -2

who, like Armijo, had no notice that their ordinary compensation could expose them to such penalties. That result cannot be reconciled with the Anti-Kickback Act's text, history, or purpose—much less the rule of lenity, which requires that individuals be given fair notice of what a criminal statute forbids.

The False Claims Act allegations against Armijo fare no better. The Complaint does what the Ninth Circuit has long warned against: It lumps multiple defendants together in a pastiche of allegations, rather than specifically alleging each defendant's liability for fraud. It also relies on conclusory accusations instead of the particularized factual allegations Rule 9(b) demands. And the few non-conclusory allegations against Armijo do not show that he individually made knowing, material misrepresentations. There is no allegation that Armijo (or anyone else) hid from DOE the fact that he was a Lockheed Martin employee seconded to MSA. And while the government complains about LMSI's alleged profit, the subcontract's DOE-approved, fixed-price structure *necessarily* allowed for the possibility of profit. Nowhere does the Complaint allege that Armijo falsely described the subcontract as one for cost-reimbursement only—the only pricing structure that would have guaranteed no profit. Nor does the Complaint allege that DOE demanded a cost-reimbursement subcontract. Absent such allegations, any representations about LMSI's profit could be neither false nor material to DOE's decision to pay claims under the subcontract.

Those are just the defects apparent on the face of the Complaint. The Complaint also relies on a series of inaccuracies and omissions that tell an incomplete and misleading story. It attributes to Armijo actions that he did not

FRANK ARMIJO'S MOTION TO DISMISS -3

take, that he did not have the authority to take, or that he took in good faith based on the advice of seasoned subject-matter experts. It gets basic facts about Armijo wrong—incorrectly suggesting, for example, that he continuously held simultaneous roles at MSA and LMSI as those companies negotiated the subcontract (an allegation central to its theory). And it ignores numerous facts that undermine its allegations—including that, on one of the rare occasions he was asked to weigh in on the subject, Armijo urged MSA to demand *greater* discounts from LMSI.

But even taking the Complaint's allegations as true, as the Court must at this stage, the government's claims fail. The Complaint does not state a plausible claim against Armijo under either the Anti-Kickback Act or the False Claims Act—let alone one that survives the heightened pleading standard for claims sounding in fraud. The Complaint should be dismissed.

## BACKGROUND

### I.    Regulatory Background

The Federal Acquisition Regulation ("FAR") requires government contracting officers to "[p]urchase supplies and services . . . at fair and reasonable prices." 48 C.F.R. § 15.402(a). "Fair and reasonable" does not mean government contractors must make no profit. To the contrary, the FAR explains that the prospect of profit encourages contractors "to control costs and perform effectively." *Id.* § 16.202-1.

The FAR thus encourages contracts with fixed-price components. Under a fixed-price contract, the government pays a set price without "any adjustment on the basis of the contractor's cost experience in performing the contract." *Id.*

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

Because a contractor's actual costs may vary from anticipated costs, such contracts carry an inherent potential for profit—or loss. By "plac[ing] upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss," a fixed-price contract "utilizes the basic profit motive of business enterprise" to encourage efficient performance. *Id.*; *id.* § 16.103(b).[1]

There are other possible arrangements as well. Under a cost-reimbursement contract, for example, the contractor is paid only its actual "incurred costs"— earning no profit. *Id.* § 16.301-1; *see id.* § 16.302(a). A cost-reimbursement arrangement may, however, be combined with a merit-based "award fee" that, if awarded, serves as the contractor's profit. *See id.* § 16.305; ECF No. 1 at ¶ 36.

The FAR recognizes that prime contractors will often subcontract with affiliated companies with relevant expertise. Affiliated subcontractors generally may be paid only on a cost-reimbursement basis, without any subcontractor profit. *See* 48 C.F.R. § 31.205-26(e). But the FAR creates several exceptions to that

---

[1] There are several kinds of contracts with fixed-price components. A "firm-fixed-price" contract pays the contractor a set amount to complete the contract work. *See* 48 C.F.R. § 16.202-1. A "fixed unit rate" contract pays a set price for a specified quantity of performance (*e.g.*, labor rates per hour). *See* W. Noel Keyes, *Government Contracts Under the Federal Acquisition Regulation* § 36.1 (3d ed. 2018). A "time-and-materials" contract pays for labor at "fixed hourly rates" that cover "wages, overhead, general and administrative expenses, and profit"; it also pays the contractor's "[a]ctual cost for materials." 48 C.F.R. § 16.601(b).

FRANK ARMIJO'S MOTION TO DISMISS -5

1    restriction. As relevant here, the restriction on profit does not apply to "commer-

2    cial" items. *Id.* § 31.205-26(f); *see id.* §§ 15.403-1(b)(3), 31.205-26(e)(2).[2]

3           For commercial items, contracting officers must determine the reason-

4    ableness of a proposed price "***without evaluating*** its separate cost elements and

5    ***proposed profit***." *Id.* § 15.404-1(b)(1) (emphasis added); *see id.* § 15.403-1(b)(3),

6    (c)(3). That price analysis involves such techniques as comparing proposed prices

7    to historical prices or published price lists, considering independent government

8    estimates, performing market research, and analyzing "data other than certified

9    cost or pricing data." *Id.* § 15.404-1(b)(2). Contracting officers "should not become

10   preoccupied with any single element," and must "balance the contract type, cost,

11   and profit or fee negotiated to achieve . . . a price that is fair and reasonable to both

12   the Government and the contractor." *Id.* § 15.405(b).

13

14   _____

15   [2] An item is "commercial" if it "is of a type customarily used by the general public

16   or by non-governmental entities for purposes other than governmental purposes"

17   and has been (or has been offered to be) "sold, leased, or licensed to the general

18   public" or, alternatively, if it consists of "[s]ervices of a type offered and sold

19   competitively in substantial quantities in the commercial marketplace based on

20   established catalog or market prices for specific tasks performed or specific

21   outcomes to be achieved and under standard commercial terms and conditions."

22   48 C.F.R. § 2.101. Commercial items include, but are not limited to, those found

23   in General Services Administration ("GSA") schedules. *See MSC Indus. Direct*

24   *Co. v. United States*, 126 Fed. Cl. 525, 528 (2016).

FRANK ARMIJO'S MOTION TO DISMISS -6

## II.  Factual Background

### A.  MSA is awarded the Mission Support Contract and retains LMSI as the subcontractor for IR/CM services.

This case stems from a Mission Support Contract ("Contract") awarded by DOE to support the cleanup of the Hanford Nuclear Site. ECF No. 1 at ¶¶7-8, 32-35. The winning bid was submitted by MSA, a joint venture between a subsidiary of Lockheed Martin Corporation ("LMC") and two other companies. *Id.* ¶¶8, 48.

The Complaint focuses on one aspect of the work covered by the Contract: Information Resource/Content Management ("IR/CM") services—essentially, tech support. LMSI, an LMC subsidiary, had "perform[ed] the same services" "for years" under "the predecessor contractor at Hanford," an unrelated company called Fluor Hanford. *Id.* ¶113. Given LMSI's experience, MSA and LMC proposed that LMSI continue to provide IR/CM services at Hanford. They therefore identified "LMSI [as] a preselected subcontractor for the IR/CM work scope" in their prime contract proposal to DOE. *Id.* ¶45. DOE accepted that proposal and awarded the Contract to MSA in 2009. *Id.* ¶48.

To ensure "continuity of service," MSA directed LMSI to continue its IR/CM work pending DOE approval of a new IR/CM subcontract. *Id.* ¶74. MSA informed DOE of that decision, *id.*, and there is no allegation DOE ever objected.

### B.  Frank Armijo is seconded to MSA.

Frank Armijo had overseen LMSI's IR/CM work "for years" under the company's earlier subcontract with Fluor. ECF No. 1 at ¶113. So when MSA took over as prime contractor, he was a natural choice to oversee that work for MSA. As

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

a result, Armijo was "seconded" to MSA to serve as its vice president for information technology. *See id.* ¶11 (A "secondment" is a temporary reassignment from one's regular employer to another, often an affiliate.) Armijo was not "MSA's subcontracts manager"; that role belonged to someone else. *Id.* ¶56.

According to the Complaint, Armijo left MSA in December 2009 to participate in an executive development program as a Vice President at LMC. *Id.* ¶11. In May 2010, he returned to MSA—this time as President and General Manager—while continuing to serve as an LMC Vice President. *Id.*[3]

It was no secret to DOE that MSA, LMC, and LMSI were affiliated entities, or that individuals like Armijo were seconded from one company to another. To the contrary, the Contract expressly required LMC to guarantee MSA's performance as one of MSA's parents, and the Complaint alleges the same person signed that guarantee on behalf of both companies. *Id.* ¶39. DOE officials repeatedly

---

[3] The Complaint's account of Armijo's professional history is badly flawed. Armijo did not "serve[] as an LMC Vice President" before or during his initial secondment to MSA. ECF No. 1 at ¶11. He served only as director of *LMSI* before joining MSA in 2009, and he had no continuing duties at LMSI after joining MSA. Armijo also did not "briefly le[ave] MSA to participate in an LMC executive program." *Id*. Armijo left because he was promoted to LMC's Vice President for Energy and Environment; he returned to MSA only because of a later-arising need for his expertise. Those errors are irrelevant for present purposes (where the Complaint's factual allegations must be taken as true), but they reflect the Complaint's general carelessness with the facts.

FRANK ARMIJO'S MOTION TO DISMISS -8

recognized the relationship among MSA, LMC, and LMSI. *See, e.g.*, *id.* ¶49. And there is no allegation that DOE was unaware Armijo held positions at both LMC and MSA.

### C.    MSA and LMSI propose terms for the LMSI subcontract.

The IR/CM subcontract with LMSI required DOE consent. ECF No. 1 at ¶52. To that end, MSA and LMSI offered several proposals, with DOE ultimately granting conditional consent in February 2011. *Id.* ¶¶114-115.

MSA's original proposal for the LMSI subcontract was submitted with its final proposal on the prime contract in May 2008. *Id*. ¶45. There is no allegation Armijo was responsible for that submission. In any event, the submission proposed a "firm fixed price subcontract" covering all IR/CM services. *Id.* As explained above, *supra* pp. 4-5, such contracts have an inherent potential for profit—or loss—if a contractor's actual costs are different than anticipated.

LMC recognized that the IR/CM work assigned to LMSI was "commercial" and thus eligible for profit. ECF No. 1 at ¶¶42-43. The Complaint admits that the defendants consistently advocated that position to DOE. *See, e.g.*, *id.* ¶¶64, 75, 111. And it never alleges that LMSI provided services or items that were *not* "commercial" within the meaning of the FAR.

The Defense Contract Audit Agency ("DCAA") conducted an audit of the May 2008 subcontract proposal. *Id.* ¶46. The Complaint does not allege that DCAA or DOE told any defendant that the IR/CM services did not qualify as commercial. Nor does it allege that DOE ever insisted that the LMSI subcontract be made on a cost-reimbursement basis, which would eliminate potential profit.

FRANK ARMIJO'S MOTION TO DISMISS -9

According to the Complaint, LMSI responded to the audit in August 2009. *Id.* ¶63. There is no allegation that Armijo was responsible for that submission. LMSI continued to take the position "that the services it was offering were commercial and therefore could include profit." *Id.* ¶64.

In any event, before LMSI's response to the DCAA audit, "the structure of the LMSI subcontract for the IR/CM work" had been substantially "revised" in June 2009. *Id.* ¶53.[4] It went from a single fixed sum to "a variety of fixed unit rates, firm fixed price and time and materials services." *Id.*; *see id.* ¶60. As previously discussed, contracts with fixed-price components, such as these, have an inherent potential for contractor profit (or loss). *See supra* pp. 4-5.

The subcontract proposal was further revised in December 2009, before being submitted for DOE's consent in January 2010. ECF No. 1 ¶¶69, 74. By that time, however, Armijo was no longer at MSA. *Id.* ¶11. The Complaint does not allege Armijo was responsible for the revised proposal or the submission to DOE. Nor does it allege Armijo had any role in a March 2010 presentation to DOE regarding the proposal. *Id.* ¶77.

Armijo returned to MSA as its President at the end of May 2010. *Id.* ¶80. The Complaint alleges he emailed a DOE official a few months later regarding the LMSI subcontract. *Id.* ¶84. In that email, Armijo explained that, after the DCAA

---

[4] The Complaint alleges Armijo revised the proposal in June 2009. ECF No. 1 at ¶53. That is incorrect; Armijo did not—and did not have authority to—unilaterally revise the proposal. As the Complaint recognizes, Armijo was neither "MSA's subcontracts manager" nor the "LMC contracts manager." *Id.* ¶¶56, 68.

FRANK ARMIJO'S MOTION TO DISMISS -10

audit, MSA had "'negotiated with LMSI an additional discount of 4%.'" *Id.* The Complaint nowhere alleges the proposed prices did not reflect a 4% discount compared to the May 2008 proposal.

### D.  DOE conditionally consents to the LMSI subcontract.

In October 2010, LMSI prepared a "Best and Final Offer" for the IR/CM subcontract. ECF No. 1 at ¶89. That revised proposal included additional "fixed price estimates," *id.*, that (again) carried an inherent potential for profit or loss. It also reflected a greater discount (7.13% versus 4%) than the proposal submitted to DOE in January 2010. *Id.* ¶95. MSA transmitted LMSI's Best and Final Offer to DOE in November 2010, along with a revised consent letter. *Id.* ¶¶102-103.

While the Complaint does not allege Armijo was responsible for any statements in LMSI's Best and Final Offer, it claims he was "among those" who prepared the consent letter. *Id.* ¶102. However, the only particular role it alleges Armijo took was as one of three people who drafted a table setting forth "'highlights'" of the consent request. *Id.* ¶110. That table stated the "'estimated net profit potential'" for LMSI was 1%, *id.*, which (as the body of the letter stated) would be at risk if LMSI failed to perform adequately. *Id.* ¶109. The table also stated that the proposed pricing reflected a 7.1% discount from a GSA rate schedule. *Id.* ¶110.

In February 2011, DOE provided conditional consent to the LMSI subcontract. The conditional consent was contingent on removal of what DOE called "'the proposed 1 percent affiliate fee.'" *Id.* ¶¶114-115. In response, MSA and LMSI "agreed to reduce LMSI's proposed labor rates by 1 percent." *Id.* ¶116. The

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

Complaint alleges this was a false statement because at various points in time LMC had internally estimated that LMSI would earn more than 1% profit on the subcontract. *See id.* ¶¶44, 53, 68, 79, 87, 109. But nowhere does it contend that these internal calculations were anything more than estimates.

The Complaint also alleges that the November 2010 consent request falsely represented that LMSI was offering prices based on an existing GSA contract ("Contract 4863G"). *Id.* ¶104. As the Complaint explains, due to ongoing negotiations regarding consolidation with similar schedules, Contract 4863G's rates had not been updated since 2007. *Id.* ¶¶66, 78, 82. LMSI's pricing under the subcontract therefore applied a yearly "'escalation factor'" to the frozen Contract 4863G rates to account for inflation and cost increases, before applying a discount to the resulting rates. *Id.* ¶73. The Complaint takes issue with those discounted rates based on its conclusory allegation that the escalated pricing was "inflated." *Id.* ¶104; *see id.* ¶¶71-72. It does not contend the escalation factor was unreasonable, was untethered from inflation and cost increases, or outstripped historical increases. Nor does the Complaint explain why DOE was entitled to—or why any company would agree to—2007 rates (with a discount) for a subcontract applicable to 2011 and beyond.

### E.  Armijo participates in Lockheed Martin's Management Incentive Compensation Program.

Like many companies, Lockheed Martin offers its employees bonuses to encourage and reward excellent performance. The Complaint alleges Armijo participated in LMC's Management Incentive Compensation Program ("MICP")

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

from 2009 to 2015. ECF No. 1 at ¶121. The Complaint alleges Armijo was an LMC executive for that entire period, *see id.* ¶11, and it does not allege that Armijo's compensation was out of line with that of other LMC executives with comparable positions and performance reviews. Nonetheless, it alleges that ***all*** of Armijo's incentive compensation for 2009-2015 was a "kickback" given "in return for improperly using his MSA position to provide LMC and LMSI with favorable treatment"—namely, allowing LMSI to earn profit on its IR/CM subcontract. *Id.* ¶121.

The Complaint does not explain how Armijo solicited that alleged kickback, who supposedly offered it, or who agreed to pay it. The only effort the Complaint makes to link Armijo's incentive compensation to the IR/CM subcontract is an allegation that one of the accomplishments Armijo noted in one of his annual self-evaluations was "'[a]chiev[ing] commerciality on the LM Subcontract to MSA.'" *Id.* ¶122. The Complaint offers no factual allegation that the achievement actually factored into Armijo's incentive compensation for that year; and it makes no allegation at all connecting the IR/CM subcontract to his compensation for any other year. Nor does the Complaint allege that Armijo made any effort to conceal his incentive compensation or disguise the nature of the payments.

## STANDARD OF REVIEW

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint cannot rest on "'allegations that are merely conclu-

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

sory, unwarranted deductions of fact, or unreasonable inferences.'" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Nor is it enough to "plead[] facts ... 'merely consistent with' ... liability"; a complaint must eliminate "'obvious alternative'" lawful explanations. *Iqbal*, 556 U.S. at 678, 682.

Where, as here, claims sound in fraud, Federal Rule of Civil Procedure 9(b) requires the circumstances of fraud to be alleged "with particularity." *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (Rule 9(b) applies to False Claims Act); *United States v. Peterson*, No. CV-11-5137-EFS, 2012 WL 315443, at *5 (E.D. Wash. Feb. 1, 2012) (Anti-Kickback Act). The plaintiff must allege "'the who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

## **ARGUMENT**

The Complaint alleges four counts against Armijo: violation of the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8702, 8706 (Count III); false claims and false statements in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) & (B) (Counts I and II); and unjust enrichment (Count V). ECF No. 1 at ¶¶ 132-146, 149-150. Each claim suffers from fatal flaws and should be dismissed.

Armijo adopts and incorporates the arguments in LMC/LMSI's and MSA's Motions to Dismiss the same claims (hereinafter "LMC Mot." and "MSA Mot."). As explained below, the claims are especially defective as to Armijo.

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1    **I.      The Complaint fails to state an Anti-Kickback Act claim (Count III).**

2        The government casts Armijo's ordinary incentive compensation from

3    Lockheed Martin as "kickbacks"—that is, payments "to improperly obtain or

4    reward favorable treatment in connection with a prime contract or a subcontract

5    relating to a prime contract." 41 U.S.C. § 8701(2). That misguided theory defies

6    Supreme Court precedent and would threaten devastating and unexpected liability

7    for countless individuals like Armijo. Even apart from those defects, the

8    government's kickback allegations fail to state a plausible claim—much less one

9    that satisfies Rule 9(b)'s demanding particularity standard.

10       **A.      Compensation from one's employer cannot be a kickback.**

11          **1.      *Skilling* forecloses the government's kickback theory.**

12       The "kickbacks" the government accuses Armijo of taking were actually

13   ordinary incentive compensation offered by his employer, Lockheed Martin, under

14   its Management Incentive Compensation Program ("MICP"). *See* ECF No. 1 at

15   ¶¶ 118, 121-123. As a matter of law, that cannot not qualify as a "kickback."

16       The Supreme Court made that clear in *Skilling v. United States*, 561 U.S.

17   358 (2010). There the Court held that the honest services fraud statute covers only

18   "paradigmatic cases of bribes and kickbacks." *Id.* at 411. To decide whether the

19   conduct before it qualified as a "kickback," the Court applied the definition

20   applicable under the Anti-Kickback Act, *see id.* at 412-13 (quoting predecessor

21   statute), and found the government's theory lacking. The government, the Court

22   explained, did not "allege that Skilling solicited or accepted side payments from a

23   third party in exchange for" his conduct. *Id.* at 413. Instead, it alleged only that he

24

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

had "'profited from the fraudulent scheme . . . through the receipt of salary and bonuses'" from his employer. *Id*. That, the Court held, was not a kickback. *Id.*

The Complaint here alleges no more. Far from being paradigmatic "side payments from a third party," Armijo's MICP payments were merely the sort of "'bonuses'" from a longtime employer that *Skilling* held fall outside the statute. 561 U.S. at 413. Indeed, Armijo's incentive compensation was far more mundane than the compensation at issue in *Skilling*. There the defendants allegedly conspired to "'enrich[] themselves'" by inflating their company's stock price, obtaining stock as bonuses, and selling that stock. *Id.* at 369; *see id.* at 413. Here, by contrast, there is no allegation that LMC's incentive compensation program was administered in anything but the ordinary course. *See* LMC Mot. 6, 25-26.

The government seems to assume it makes a difference that Armijo had responsibilities at MSA as well as LMC. But as LMC explains, that theory fails because MSA and LMC (and LMSI) were affiliates and therefore a single "person" for purposes of the AKA. *See* LMC Mot. 18-19; *Morse Diesel Int'l, Inc. v. United States*, 66 Fed. Cl. 788, 799 (2005) (joint venture and parent were same "person" under the AKA). Compensation from LMC thus cannot be considered the sort of "'prototypical'" payment from a "third party" that *Skilling* demands. 561 U.S. at 413; *see id.* at 411 (limiting statute to "paradigmatic cases of . . . kickbacks").[5]

---

[5] Likewise, the principles underlying the intra-corporate conspiracy doctrine foreclose liability for supposed "kickbacks" where (as here) the government alleges the relevant players operated as a single economic entity. *See* LMC Mot. 11-19.

FRANK ARMIJO'S MOTION TO DISMISS -16

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1

2

### 2.    Fair-notice and lenity concerns defeat the government's kickback theory.

3    Even if the government's novel extension of the AKA were colorable—and

4    it is not—it would fail in light of the grave fair-notice problems it would create. It

5    is well established that "'ambiguity concerning the ambit of criminal statutes

6    should be resolved in favor of lenity.'" *Skilling*, 561 U.S. at 410. If "the

7    Government's position" is not "unambiguously correct," any remaining ambiguity

8    must be resolved in favor of the defendant. *United States v. Granderson*, 511 U.S.

9    39, 54 (1994). By construing criminal statutes to apply "only to conduct clearly

10    covered," the rule of lenity ensures that individuals have "fair warning" of what the

11    law forbids. *United States v. Lanier*, 520 U.S. 259, 266 (1997).

12    The rule of lenity applies because the AKA provides for criminal penalties,

13    41 U.S.C. § 8707, and courts "'must interpret the statute consistently, whether

14    [they] encounter its application in a criminal or noncriminal context.'" *United*

15    *States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 378 (5th Cir.

16    2017). The AKA does not define key terms such as "improperly" or "favorable

17    treatment," *id.*, and so it is at least ambiguous as to whether it covers ordinary

18    incentive compensation from one's employer like that alleged here. Any ambiguity

19    therefore must be resolved in Armijo's favor. The Court must dismiss if he lacked

20    "fair notice" that his conduct would be "considered 'improper,' thereby

21    constituting a 'kickback' under the statute." *United States v. Burger*, No. CR 99-

22    0439 SI, 2000 WL 33910676, at *4 (N.D. Cal. June 6, 2000).

23

24

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1    *Burger* is instructive. The defendant there managed subsidized housing

2    projects. In exchange for his appointment as manager for certain projects, he

3    agreed to split federally paid management fees with the projects' owner. *Id.* at *1.

4    The government alleged that those payments constituted kickbacks in violation of

5    the AKA. But the court dismissed those claims, holding that the defendant did not

6    have sufficient notice to determine his conduct "was 'improper.'" *Id.* at *6-7. The

7    court so held even though a HUD policy, published shortly after the challenged

8    conduct began, expressly prohibited "'payments . . . to the owner in return for

9    awarding the management contract to the agent,'" and even though a later

10    memorandum from HUD's Inspector General criticized fee-splitting as

11    "'indefensible'" and "'essentially a kickback scheme.'" *Id.* at *5-6.

12    The case for lenity is even stronger here. The AKA's text and history reveal

13    no hint that ordinary incentive compensation could be considered a kickback under

14    these circumstances. *See* LMC Mot. 12-14. And the Complaint contains no

15    allegation suggesting Armijo was on notice that participating in LMC's industry-

16    standard incentive compensation program could expose him to liability. There is

17    no showing that Armijo could have known that some government officials deemed

18    that conduct "a disfavored practice," *Burger*, 2000 WL 33910676, at *6—let alone

19    a violation of a criminal statute. Nor would case law have provided the requisite

20    notice. Armijo has not located *any* case basing AKA liability on employee

21    compensation, much less compensation paid in the ordinary course. To the

22    contrary, controlling precedent *rejects* the notion that "'salary and bonuses'" from

23    one's employer can be kickbacks. *Skilling*, 561 U.S. at 413.

24

FRANK ARMIJO'S MOTION TO DISMISS -18

The government's novel kickback theory, moreover, would threaten grave consequences far beyond this case. It is commonplace for employees of government contractors to have positions at both a parent company (such as LMC) and an affiliate (such as MSA). Under the government's approach, those employees would be exposed to unexpected and potentially ruinous liability whenever they receive compensation bearing even a tenuous connection to a contract the government—in hindsight——deems too "favorable" to one party or another. A seconded employee who so much as touts her success with an affiliated joint venture to her primary employer would end up jeopardizing all compensation she subsequently receives. Indeed, that is precisely the government's theory here: Because Armijo once included a single line in a single self-evaluation mentioning the LMSI subcontract, the government claims that *all* of his incentive compensation from LMC over the span of seven years was illegal "kickbacks." *See* ECF No. 1 at ¶¶121-123; *infra* pp. 20-22. There is no way that Armijo, or anyone else in his shoes, could have foreseen that drastic and arbitrary result.

The government's approach "provides no reasonable notice to those in the government-contracting arena as to when their acts are innocent and when they are not." *Vavra*, 848 F.3d at 378. It would subject countless individuals to unforeseen liability—even criminal penalties—for conduct they had no reason to think forbidden. The government's theory should be rejected.

At the very least, given the lack of support for the government's theory, it is clear that Armijo could not have "*knowingly* engage[d] in conduct prohibited by section 8702"—*i.e.*, soliciting or accepting a "kickback." 41 U.S.C. §8706(a)(1)

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1   (emphasis added); *see McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015)

2   ("knowingly" applies "not just to the statute's verbs but also to the object of those

3   verbs"). For that reason too, the AKA claim against Armijo must be dismissed.

4   **B.    The Complaint fails to allege a plausible kickback claim.**

5   Compensation from one's own employer categorically cannot qualify as a

6   "kickback." But even if that were not so, the Complaint would still fail to state a

7   plausible AKA claim with the particularity Rule 9(b) demands.

8   **1.    The Complaint does not allege Armijo's incentive compen-**

9   **sation was in return for favorable treatment to LMSI.**

10  The Complaint asserts that ***every cent*** Armijo received under Lockheed

11  Martin's incentive compensation program from 2009 to 2015 was a reward for

12  securing LMSI profit on the IR/CM subcontract. ECF No. 1 at ¶121. But it fails to

13  allege facts sufficient to make that conclusory assertion even remotely plausible.

14  That is fatal because the AKA "requires a link between the [alleged] kickback and

15  some benefit being sought or already received." *Vavra*, 848 F.3d at 378.

16  The only attempt the Complaint makes to tie seven years of Armijo's

17  incentive compensation to the LMSI subcontract is a single line Armijo wrote in a

18  2011 self-evaluation: "'Achieved commerciality on the LM Subcontract to MSA

19  which will deliver in excess of $100 million in EBIT thru the 10-year life of the

20  program.'" ECF No. 1 at ¶122 (alteration omitted). The government makes no

21  effort to connect the subcontract to the incentive compensation Armijo received for

22  any of the other six years. At a minimum, the AKA claim must be dismissed with

23  respect to those years.

24

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1    Even as to 2011, the claim falls well short of the mark. Because an AKA

2    claim sounds in fraud, the government must allege the circumstances constituting

3    the misconduct with particularity. But the Complaint is conspicuously short on

4    relevant details. It does not identify who at LMC determined Armijo's incentive

5    compensation, how that compensation was determined, or what review process

6    was conducted. As a result, there is no basis for inferring that the decision makers

7    who set Armijo's compensation acted solely, primarily, or even partly on the basis

8    of the claimed achievement the government relies on. And if noting one achieve-

9    ment among many in a self-evaluation, without more, counts as "soliciting" a

10   kickback, then employees all across the Nation have reason to fear surprising civil

11   and even criminal liability. *See supra* pp.18-19.

12   The Complaint also fails to rule out the "'obvious alternative explanation'"

13   that Armijo's compensation reflected his general success as an LMC Vice Presi-

14   dent across a broad range of considerations. *Iqbal*, 556 U.S. at 682. The Complaint

15   does not even acknowledge the myriad other factors that likely affected Armijo's

16   incentive compensation. Instead, it offers only a "'naked assertion[]'" that his

17   compensation was a reward for favorable treatment to LMSI. *Id.* at 678; *see* ECF

18   No. 1 at ¶121. Surmise cannot substitute for facts.

19   Those failings are even more glaring because the sentence fragment the

20   government seizes upon appears in a four-page, single-spaced document, as one

21   small part of Armijo's description of achievements in one of ten assessment

22   categories that affected his MICP compensation. *Compare* ECF No. 1 at ¶122,

23

24

FRANK ARMIJO'S MOTION TO DISMISS -21

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

*with* Exh. 1 (2011 MICP Objectives).[6] Armijo's accomplishments for that year spanned his *entire* LMC portfolio (of which LMSI was only a small part), and ranged from winning "critical" Federal Energy Management Program contracts for "Hill AirForce Base and the DOE Data Center Consolidation" to "cross selling [LMC's] capabilities to existing and new clients . . . includ[ing] AEP, PSEG LIPA, ConEdison and several others." Exh. 1 at 3. Armijo's evaluator did not mention or rely upon the LMSI subcontract, and in fact found that Armijo had "missed" financial goals for the category that included the subcontract. *Id.* at 1-2. The government's sole alleged support thus contradicts its theory.

### 2.    The Complaint does not allege Armijo acted improperly.

Even if the Complaint sufficiently connected Armijo's incentive compensation to the LMSI subcontract—and it does not—it would still fail to allege with

---

[6] A "court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Armijo's 2011 MICP Objectives evaluation is expressly quoted in the Complaint (¶122), and it is the only factual support allegedly tying the incentive compensation to the LMSI subcontract. An authentic copy of the 2011 MICP Objectives (hereinafter "Exh. 1") is filed under seal as Exhibit 1 to the Declaration of Frank Armijo filed in support of this Motion to Dismiss and the related Motion to Seal.

FRANK ARMIJO'S MOTION TO DISMISS -22

particularity that the compensation was sought or given "to **_improperly_** obtain or reward favorable treatment." 41 U.S.C. § 8701(2) (emphasis added).

Courts have construed "improperly" in this context as meaning "'not in accord with . . . right procedure,'" and have looked to, "[a]mong other variables, the size and timing of the gifts and the nature of the favorable treatment." *Vavra*, 848 F.3d at 379. Wherever one looks, impropriety is absent. The government does not, for example, allege that LMC deviated from normal procedures in administering its incentive compensation program. *See* LMC Mot. 6, 25-26. Nor is there anything improper about arguing in favor of commercial profit on a government subcontract, *see* ECF No. 1 at ¶ 122—especially where the prime contract expressly permits it, *id.* ¶ 37, and the government agrees to a fixed-price contract with an inherent potential for contractor profit (or loss).

The only purported evidence that Armijo sought to give improperly favorable treatment to LMSI is a September 2012 email stating that Armijo was "'happy to do whatever [LMC] needs for 2012.'" *Id.* ¶ 81. That vague and innocuous language, which the government strips of any context, supports no inference of wrongdoing. Armijo was an LMC employee, and LMC was a parent to both MSA and LMSI. A general expression of willingness to assist LMC hardly reflects a purpose to improperly favor one of its affiliates. Moreover, a 2012 statement that Armijo was happy to help LMC "**_for 2012_**" cannot establish that Armijo improperly favored LMSI in securing a profitable subcontract in **_2011_** and earlier—the only favorable treatment Armijo is alleged to have provided.

For all these reasons, the AKA claim against Armijo should be dismissed.

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

## II. The Complaint fails to state a False Claims Act claim (Counts I & II).

An FCA plaintiff must allege "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006). The Complaint fails to allege those elements with the particularity Rule 9(b)'s heightened pleading standard demands.

### A. The Complaint does not plausibly allege Armijo's participation in the alleged fraud.

Under Rule 9(b), the government must "'identify the role of each defendant in the alleged fraudulent scheme.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (brackets omitted). It may not "'lump multiple defendants together but [must] differentiate [its] allegations when suing more than one defendant.'" *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011). The Complaint defies those principles, frequently lumping Armijo in with the corporate defendants while providing no details tying him to the alleged misconduct.

For example, the government does not allege that Armijo submitted the allegedly false subcontract proposals or claims for payment.[7] It affords no

---

[7] Regarding MSA's November 2010 consent letter, the government alleges that Armijo and two other employees "were among those who took the lead in preparing the letter," without providing details on Armijo's role. ECF No. 1 at ¶102; *see id.* ¶110 (alleging Armijo was one of three people involved in drafting a table). That is not enough, particularly when the government has chosen to sue only one of those three. "In the context of a fraud suit involving multiple

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

significance to the fact that Armijo was ***not even employed by MSA*** when it first requested DOE's consent to the subcontract in January 2010—even though the government's theory entirely depends on Armijo using his MSA position to benefit LMC. ECF No. 1 at ¶74; *see id.* ¶11. And it frequently treats Armijo's being copied on an email as evidence that he was involved in deception concerning its subject matter. *See, e.g.*, *id.* ¶¶50, 55, 56, 67.

Other allegations do not mention Armijo at all or mention him only in "conclusory statements" that are insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. The Complaint, for example, states that "LMSI and LMC falsely inflated the number of planned full time equivalent (FTE) employees" in comparison with internal estimates. ECF No. 1 at ¶¶61, 96-98. But it does not tie Armijo to that alleged inflation or otherwise support its conclusory allegation that "Defendants LMC, LMSI, MSA, ***and Armijo*** knowingly provided and used these and other false and inflated FTE estimates." *Id.* ¶97 (emphasis added); *see id.* ¶98 (similar).

There are similarly no facts connecting Armijo to alleged double-billing for (1) the use of Hanford Atomic Metal Trades Council "'bargaining unit'" labor, or (2) unspecified "site services that were not even included in the IR/CM statement of work." *Id.* ¶¶99, 100. Nor is Armijo tied to conclusory allegations that LMSI submitted false claims through Washington River Protection Services, another prime contractor at Hanford. *Id.* ¶130. And one searches the Complaint in vain for

defendants, a plaintiff must, at a minimum, 'identify the role of each defendant in the alleged fraudulent scheme.'" *Swartz*, 476 F.3d at 765 (brackets omitted).

FRANK ARMIJO'S MOTION TO DISMISS -25

any allegation that Armijo made false representations about the commerciality of the services LMSI was providing. *Cf., e.g.*, *id.* ¶111 (alleging that "Defendants" submitted Case File Memorandum including false statements about commerciality, but not alleging that Armijo played any role in submitting those statements). That sort of pleading falls short of Rule 9(b)'s heightened standard.

Even when the Complaint alleges facts specific to Armijo, it bends them into **unreasonable** inferences. *See Iqbal*, 556 U.S. at 679-80. The most detailed "false statements" attributed to Armijo appear in an August 2010 email to DOE stating that DCAA had miscalculated LMSI's profit, that "a more accurate calculation . . . was 8.13 percent," and that "'MSA negotiated with LMSI an additional discount of 4% which would reduce any potential fee even more.'" ECF No. 1 at ¶¶84-85. The government fails to explain **why** those statements were false. It claims there was no "'negotiation,'" *id.* ¶85—but provides no facts supporting its conclusory allegation that Armijo "negotiat[ed] with himself, through his own MSA and LMSI subordinates," *id.* ¶57; *see id.* ¶95. Nor does the Complaint attempt to reconcile that conclusory allegation with its own recognition that responsibility for "MSA's subcontracts" and "LMC contracts" rested with others. *Id.* ¶¶56, 68. It claims Armijo falsely described the prices as discounted "from [LMSI's] GSA schedule pricing"—but the language quoted from the email does not mention the GSA schedule. *Id.* ¶¶84-85. And it argues that Armijo falsely suggested "that any additional profit to LMSI would be in the low single digits," *id.* ¶85—neglecting that internal analyses of potential double-digit profits were merely "estimates," *id.* ¶¶58, 65, and thus inherently uncertain. *See In re NovaGold Res., Inc. Sec. Litig.*,

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1    629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("'estimate' connotes uncertainty" and

2    "is inherently cautionary").

3    **B.    The Complaint does not satisfy *Escobar*'s "demanding" material-**

4    **ity standard.**

5        With those and other alleged falsehoods involving Armijo, the Complaint

6    fails to meet the FCA's "demanding" materiality standard. *Universal Health*

7    *Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016); *see* 31

8    U.S.C. § 3729(b)(4) ("'[M]aterial' means having a natural tendency to influence, or

9    be capable of influencing, the payment or receipt of money or property."). The

10   FCA "is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-

11   variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003

12   (citation omitted). So "minor or insubstantial" noncompliance cannot support a

13   finding of materiality. *Id.* Nor is a misrepresentation material "merely because the

14   Government designates compliance with a particular . . . requirement as a condition

15   of payment," or because "the Government would have the option to decline to pay

16   if it knew of the defendant's noncompliance." *Id.*

17       At their core, the Complaint's allegations focus on alleged misrepresen-

18   tations concerning the amount of profit that LMSI would earn on the subcontract.

19   *See, e.g.*, ECF No. 1 at ¶2. But DOE was fully aware of the possibility that LMSI

20   might earn profit (or incur loss). ***Every single iteration*** of the proposed subcontract

21   contained firm-fixed price and/or fixed-unit-rate elements. *Id.* ¶¶45, 53, 60, 69, 75,

22   89. Those fixed-price pricing structures ***inherently allow for contractor profit or***

23   ***loss***. *See supra* pp 4-5. And despite such pricing, ***DOE consented to the***

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

1    *subcontract anyway*. *See* ECF No. 1 at ¶114. That approval, with full knowledge

2    that LMSI might earn profit, demonstrates that LMSI's ability to earn profit was

3    not material to DOE. *See Escobar*, 136 S. Ct. at 2003 ("[I]f the Government pays a

4    particular claim in full despite its actual knowledge that certain requirements were

5    violated, that is very strong evidence that those requirements are not material.").

6        If eliminating the ability to profit were actually material, DOE would have

7    insisted that LMSI provide services under a cost-reimbursement subcontract—the

8    only pricing structure that would have guaranteed no profit for LMSI. *Supra* pp. 4-

9    5; s*ee supra* p. 9. Nowhere does the Complaint allege that DOE ever made that

10   demand. Nowhere does the Complaint allege that Armijo falsely represented to

11   DOE that the subcontract was made on a cost-reimbursement basis. Without those

12   allegations, the Complaint has not alleged materiality.

13       The amount of LMSI's profit is immaterial for another reason as well. MSA

14   and LMSI consistently described the services LMSI provided as commercial, and

15   the Complaint does not allege otherwise. *See supra* pp. 9, 10. In those

16   circumstances, even the government concedes that profit was permissible under the

17   prime contract. ECF No. 1 at ¶37; *see* 48 C.F.R. §31.205-26(e)(2); *id.* §15.403-

18   1(b). Given that the False Claims Act does not reach "garden-variety breaches of

19   contract or regulatory violations," it follows *a fortiori* that the government cannot

20   establish materiality where the defendants actually ***complied*** with applicable "stat-

21   utory, regulatory, [and] contractual requirement[s]." *Escobar*, 136 S. Ct. at 2003.

22       Moreover, many of the statements the Complaint attributes to Armijo came

23   in response to DCAA's audit of the May 2008 proposal that DOE ***did not approve***.

24

FRANK ARMIJO'S MOTION TO DISMISS -28

*See, e.g.*, ECF No. 1 at ¶¶84-85 (allegedly false statements about DCAA's "evaluation of the original LMSI subcontract proposal"); *id.* ¶47 (allegedly false statements about analysis done "to respond to the DCAA audit"); *see also id.* ¶53 (alleging post-audit revision). It is not plausible that alleged misrepresentations relating to the May 2008 proposal affected DOE's willingness to pay under a **restructured** subcontract proposal approved years later in February 2011. *See id.* ¶114.[8]

### C.    The Complaint does not allege Armijo acted knowingly.

The Complaint also fails to allege scienter regarding Armijo. Taking the Complaint's factual allegations as true, they at most suggest that Armijo (1) was aware of and involved in efforts to justify the LMSI subcontract based on the commercial nature of LMSI's services, ECF No. 1 at ¶¶54, 80, as defendants consistently maintained, *see id.* ¶¶64, 75; and (2) knew that LMSI's proposed rates were based on GSA rate escalations that had not yet been officially approved, *id.* ¶¶66, 82. Even if the defendants were wrong about commerciality of the services and the propriety of escalating the GSA rate, such allegations do not show Armijo was knowingly engaged in a scheme to **defraud** the government. At most, they show a difference in interpretation of law and the contract. And "'[i]nnocent

---

[8] As MSA explains, the Complaint fails to allege materiality for other reasons as well. *See* MSA Mot. 12-16.

Kutak Rock LLP
510 W. Riverside Ave., Suite 800
Spokane, WA 99201-0506
(509) 747-4040; fax (509) 747-4545

mistakes, mere negligent misrepresentations and differences in interpretations' are not sufficient for False Claims Act liability to attach." *Hendow*, 461 F.3d at 1174.[9]

### III.    The Complaint fails to state an unjust enrichment claim (Count V).

The claim for unjust enrichment must be dismissed as well. Such a claim requires that (1) "the defendant receives a benefit"; (2) "the received benefit is at the plaintiff's expense"; and (3) "the circumstances make it unjust for the defendant to retain the benefit without payment." *Mastaba, Inc. v. Lamb Weston Sales, Inc.*, 23 F. Supp. 3d 1283, 1295 (E.D. Wash. 2014).

The Complaint fails to satisfy at least the second and third elements against Armijo. It alleges that LMC, LMSI, and Armijo were unjustly enriched "[b]y receiving inflated, unreasonable, and unallowable payments and profits from [DOE]." ECF No. 1 at ¶150. The only benefit Armijo is alleged to have received is the ordinary incentive compensation the government calls "kickbacks." The unjust enrichment claim thus falls with the AKA claim. *See supra* pp. 15-23. Moreover, Armijo's incentive compensation was paid **by LMC**. *Id.* ¶122. There is no factual allegation that that compensation was passed on to the government, submitted by MSA as an allowable cost, or otherwise came "at the [government's] expense." *Mastaba*, 23 F. Supp. 3d at 1295. Nor is there any allegation that Armijo's compensation was dependent on achieving approval for the LMSI subcontract. *See supra* p. 22 (discussing evaluation noting Armijo missed financial goals for category that included LMSI subcontract). The claim must be dismissed.

---

[9] Armijo's lack of scienter would only be bolstered in discovery, which would show he relied in good faith on the contracting and financial expertise of others.

FRANK ARMIJO'S MOTION TO DISMISS -30

1

## <u>CONCLUSION</u>

2

All claims against Frank Armijo should be dismissed.

3

DATED this 23ʳᵈ day of April 2019.

4

By: s/ Geana M. Van Dessel
Geana M. Van Dessel, WSBA #35969

5

Kᴜᴛᴀᴋ Rᴏᴄᴋ, LLP

6

510 W. Riverside Ave., Ste. 800
Spokane, WA 99201

7

P: (509) 747-4040
Geana.VanDessel@KutakRock.com

8

By: s/ Justin Shur

9

Justin Shur, admitted *pro hac vice*

10

Lucas Walker, admitted *pro hac vice*
Eric Nitz, admitted *pro hac vice*

11

MᴏʟᴏLᴀᴍᴋᴇɴ LLP

12

600 New Hampshire Ave., NW
Washington, DC 20037

13

T: (202) 556-2000
JShur@MoloLamken.com

14

LWalker@MoloLamken.com
ENitz@MoloLamken.com

15

16

Attorneys for Jorge Francisco "Frank" Armijo

17

18

19

20

21

22

23

24

FRANK ARMIJO'S MOTION TO DISMISS -31

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on April 23, 2019, I caused the foregoing to be

3  electronically filed with the Clerk of the Court using the CM/ECF System which in

4  turn automatically generated a Notice of Electronic Filing (NEF) to all parties in

5  the case who are registered users of the CM/ECF system. The NEF for the

6  foregoing specifically identifies recipients of electronic notice.

7

8

9

10                                  By: s/ Geana M. Van Dessel

11                                  Geana M. Van Dessel, WSBA #35969
                                    KUTAK ROCK, LLP
12                                  510 W. Riverside Ave., Ste. 800
                                    Spokane, WA 99201
13                                  P: (509) 747-4040
                                    Geana.VanDessel@KutakRock.com
14

15

16

17

18

19

20

21

22

23

24
FRANK ARMIJO'S MOTION TO DISMISS -32