FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 13, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO: 4:19-CV-5021-RMP |
| Plaintiff, | |
| v. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS |
| MISSION SUPPORT ALLIANCE, LLC; LOCKHEED MARTIN SERVICES, INC; LOCKHEED MARTIN CORPORATION; and JORGE FRANCISCO ARMIJO, Frank, | |
| Defendants. | |

BEFORE THE COURT are Motions to Dismiss from Defendants Lockheed

Martin Corporation ("LMC") and Lockheed Martin Services, Inc. ("LMSI"), ECF

No. 37, Jorge Francisco "Frank" Armijo, ECF No. 39, and Mission Support

Alliance, LLC ("MSA"), ECF No. 42.

The Court heard oral argument from all Defendants and Plaintiff United

States of America ("the Government") and has reviewed all of the parties' filings

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS ~ 1

and the relevant law.[1]  Fully informed, the Court grants in part and denies in part the motions.

## I.    BACKGROUND

The United States Department of Energy ("DOE") operates the Hanford Site in southeastern Washington, a former plutonium production facility where DOE's contemporary focus is on environmental cleanup.  *See* ECF No. 1 (Complaint) at 10.  In 2007, DOE issued a request for proposals to provide mission support services, including information technology ("IT") services as well as site security, occupational health, training, and logistical support services, at the Hanford Site (the "Mission Support prime contract").  *Id.*  The Request for Proposals provided that the Mission Support prime contract "was to be a cost-reimbursement plus fee award contract in which the contractor would receive full reimbursement for its allowable, reasonable, and allocable incurred costs (incorporating the [Federal Acquisition Regulations ("FAR")] . . . regarding allowability and reasonableness of costs), and as its profit on the contract, would receive an award fee based on its performance, including how successful the contract was in limiting the cost to DOE."  *Id.* at 10−11.

---

[1] The Court notes that Defendants join in each other's arguments, to the extent that they apply equally to all Defendants.  *See* ECF Nos. 37 at 37; 39 at 20; and 42 at 9, n.1.

In clause B.11 of the Request for Proposals, the DOE set forth when the prime contractor would be allowed to receive additional profit through a subcontract with an affiliate company of the prime contractor:

B.11 ALLOWABILITY OF SUBCONTRACTOR FEE
(a)    If the Contractor is part of a teaming arrangement as described in FAR Subpart 9.6, Contractor Team Arrangements, the team shall share in the Total Available Fee as shown in Table B.4-1.  Separate additional subcontractor fee is not an allowable cost under this Contract for individual team members, or for a subcontractor, supplier, or lower-tier subcontractor that is a wholly-owned, majority owned, or affiliate of any team member.

(b)    The subcontractor fee restriction in paragraph (a) does not apply to members of the Contractor's team that are: (1) small business(es); (2) Protégé firms as part of an approved Mentor-Protégé relationship under the Section H Clause entitled, Mentor-Protégé Program; (3) subcontractors under a competitively awarded firm-fixed price or firm-fixed unit price subcontract; or (4) commercial items as defined in FAR Subpart 2.1, Definitions of Words and Terms.

ECF No. 1 at 11.

A.    *Mission Support Prime Contract Formation*

On approximately May 5, 2007, LMC submitted a notice to DOE that it intended to submit an offer to fulfill the Mission Support prime contract through the formation of a joint venture, MSA, with two other entities not parties in this suit.  ECF No. 1 at 12.  DOE "engaged offerors in a series of questions and answers and requested offerors submit Final Proposal Revisions." *Id.* at 13.  In the Final Proposal Revision submitted on May 12, 2008, MSA designated LMSI as the

subcontractor for the Information Resources and Content Management ("IR/CM") scope of work on the Mission Support prime contract. *Id.* at 13.

The subcontract with LMSI contained in the Final Proposal Revision was a firm-fixed-price subcontract for labor only and amounted to $275,672,433 for Fiscal Years 2009 through 2018. *Id.* The Final Proposal Revision "represented that the rates used to price the subcontract were from LMSI Contract Number GS-35-F-4863G (Contract 4863G), an existing LMSI government contract with the United States General Services Administration (GSA)." *Id.* Prior to being included in MSA's Final Proposal Revision as the IR/CM subcontractor, LMSI had performed the same services at Hanford "for years" for an unaffiliated predecessor contractor. *See id.* at 38.

The IR/CM subcontract with LMSI is central to the current litigation. In the course of reviewing proposals for the Mission Support prime contract, DOE requested that the Defense Contract Audit Agency ("DCAA") review the MSA proposal, including the proposed LMSI subcontract. ECF No. 1 at 13. In June 2008, DCAA questioned $59,545,246 of LMSI's proposed cost as unallowable profit. *Id.* The Complaint alleges that LMC executive, Defendant Armijo, and LMC's GSA contract manager, Jeffrey Chesko, submitted a "technical analysis," "price analysis," and "sole source justification" for the DCAA to review and "falsely told DCAA that these analyses had been performed by MSA prior to . . . the Final Proposal Revision, when in fact LMC had merely created them for the

DCAA audit in order to suggest that MSA and LMC had meaningfully analyzed LMSI's subcontract proposal." *Id.* at 14.

DOE awarded the Mission Support prime contract to MSA in September 2008, but a different offeror on the bid submitted a bid protest to the United States Government Accountability Office ("GAO"). ECF No. 1 at 14. The protesting offeror "challenged DOE's determination to award the contract to MSA because it contended that MSA would include additional profit to LMSI that would significantly increase the cost of performance by MSA relative to that of the other offeror." *Id.* The GAO dismissed the protest on December 29, 2008, allegedly based on DOE's notification to GAO of its intent to take corrective action. *Id.*

DOE re-awarded the Mission Support prime contract to MSA on April 28, 2009. ECF No. 1 at 14. DOE's Contract Officer, Alan Hopko, notified MSA and LMC that he would permit MSA to subcontract the IR/CM work to LMSI, but he would not consent to the subcontract until "it did not include [sic] fee." *Id.*

### B.    *Contract Provisions*

The Complaint characterizes the Mission Support prime contract as a "cost-reimbursement contract" under which MSA would receive full reimbursement for its costs so long as all costs charged by MSA, including subcontractor costs, were "allowable, allocable, and reasonable." ECF No. 1 at 9, 11. The prime contract provided MSA an ability to earn profit through an award fee based on MSA's performance, "including how successful the contractor was in limiting the cost to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS ~ 5

DOE." *Id.* at 11. The Mission Support prime contract also included a provision requiring MSA to comply with the Anti-Kickback Act and to avoid conflicts of interest. *Id.* Another provision required that MSA obtain agency consent for large subcontracts. *Id.*

In the Complaint, with respect to the reasonableness of costs and conflicts of interest, the Government alleges that LMC executives who were seconded to MSA, including Defendant Armijo, were pivotal in establishing LMSI's pricing while also accepting that pricing in their roles as MSA executives. *Id.* at 16−17. The Government alleges that Defendant Armijo "negotiate[ed] with himself, through his own MSA and LMSI subordinates, to establish and agree to pricing, and then falsely representing to DOE that the pricing had been appropriately and independently evaluated and determined to be fair and reasonable." *Id.*

The Complaint recites that Clause B.11 of the Mission Support prime contract prohibited MSA from receiving a "separate additional subcontractor fee" through a subcontract with an affiliate company with limited exceptions. ECF No. 1 at 11. One exception to the prohibition against a subcontractor fee is for "commercial items" as defined in the FAR, Subpart 2.1. *Id.*

### C. *Subcontract Formation*

On July 31, 2009, LMSI submitted a revised proposal to MSA, for MSA to propose to DOE, for a subcontract based on fixed-unit-rate services, fixed-price services, and time-and-materials services. ECF No. 1 at 17. In the Complaint, the

Government alleges that the July 2009 proposal: (1) "falsely represented that 'all pricing is based on discounts from LMSI published rates under'" Contract 4863G; (2) "that 'the labor rates [were] based on a three percent discount from [LMSI's] GSA Schedule 70 contract,'"; and (3) that "the proposal represented '[d]iscounted GSA time and material labor rates for CY 2009 through CY 2014.'" *Id.* at 17−18.

In August 2009, LMSI sent DOE a letter responding to the DCAA audit of the original LMSI proposal, asserting that the services LMSI was offering to provide through the subcontract were commercial and could include profit pursuant to the exception in clause B.11(b)(4). *Id.* at 19. In the Complaint, the Government alleges that LMSI falsely stated in its August 2009 communication that it had updated its proposal to include a three percent discount of the labor rates below the current GSA Schedule rates. *Id.* at 19. The Government further alleges in the Complaint that LMSI represented that it was offering "'to sell its services to MSA LLC as a commercial item'" at "'discounted prices based on GSA Commercial Rate Schedule GS-35-4863G,'" despite LMSI and LMC knowing that the "proposed prices were not discounted GSA prices at all, but were grossly inflated rates, and therefore neither 'commercially' derived nor fair and reasonable." *Id.* (further alleging that "the pricing for some of the LMSI labor categories, and all of the materials that made up the LMSI proposal, were not even part of the LMSI GSA Schedule.").

The IR/CM subcontract with LMSI continued to take shape over the course of approximately eighteen months. *See* ECF No. 1 at 15−38.

In October 2010, LMSI prepared a Best and Final Offer ("BAFO") for MSA to submit to DOE. ECF No. 1 at 29. In the Complaint, the Government portrays the BAFO as "a critical document in this case." ECF No. 53 at 45. Specifically, the Government alleges in the Complaint that the BAFO contained three false statements: (1) that the pricing was based on discounts from LMSI published rates under its GSA Contract 4863G, while the pricing for both fixed-unit rates and fixed-price services allegedly consisted of inflated amounts from the published GSA prices instead; (2) that the labor rates were based on a 7.13 percent discount from LMSI's GSA Schedule 70 prices when instead they allegedly represented an increase from the schedule prices; and (3) that the rates were based on the commercial rates in LMSI's GSA Schedule 70 contract and had been determined by GSA to be fair and reasonable when instead GSA had "negotiated far better prices than those which LMSI was proposing to MSA." *Id.* at 30−32.

The Government alleges in the Complaint that Defendant Armijo "had established the pricing on his own—deciding on behalf of LMC and LMSI what rates to offer, and deciding on behalf of MSA what MSA would accept, and charge to DOE." ECF No. 1 at 31. The Government also alleges in the Complaint that Defendant Armijo, LMC executive Richard Olsen, and MSA subcontracts manager Rich Meyer "were among those who took the lead" in preparing a letter sent by

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS ~ 8

MSA to DOE on November 2, 2010, to which the BAFO was appended, requesting

consent to the subcontract. *Id.* at 5, 16, and 34.

In the Complaint, the Government alleges that the November 2010 consent

letter conveyed the falsehoods contained in the BAFO to DOE and misrepresented

that MSA had "'sought a price reduction of additional discounts [from LMSI's

GSA schedule prices] that reflects best value.'" *Id.* at 34−35. The Government

additionally alleges:

> MSA's consent letter further falsely represented the extent of the
> additional profit anticipated by LMSI. MSA, LMSI, LMC, and Armijo
> knew that DOE had expressly stated that it would not permit any
> additional profit for LMSI on the subcontract, and had taken the
> position that LMSI's proposed subcontract should not bear any
> additional profit beyond that already earned by LMC on LMSI's IR/CM
> work through MSA's performance of the prime contract and LMC's
> part ownership of MSA. MSA, LMSI, LMC, and Armijo also knew
> that LMC was projecting, at a minimum, tens of millions of dollars and
> well above 10 percent in additional profit on the subcontract, and had
> already earned millions of dollars (in fact, exceeding these projections)
> on the work already performed and billed in 2010.
>
> MSA's consent letter nonetheless falsely stated that "relative to the fee
> amount . . . MSA did not solicit cost details. Therefore MSA does not
> have a specific LMSI proposed fee figure." In fact, MSA, through
> Armijo, Olsen, and others, knew precisely the amount of additional
> fee/profit LMC was estimating on the proposed LMSI subcontract.
>
> To compound these lies, MSA's consent letter went on to falsely state
> to DOE that although it did "not have a specific LMSI proposed fee
> figure," it had calculated an "estimated net profit potential" for LMSI's
> additional profit to be 1 percent, and that it would impose a 1 percent
> penalty on LMSI if it did not adequately perform, such as "all of
> [LMSI's] remaining fee was at risk" based on LMSI's performance. As
> Armijo, LMC, LMSI, and MSA knew, this was completely false. MSA
> did not need to "estimate" LMSI's net profit potential at all—it had

specific and contemporary information regarding precisely what additional LMSI profit LMC was estimating and could earn. Additionally, MSA, LMC, LMSI, and Armijo knew that they were anticipating, at a minimum, 11.5 percent—not 1 percent—in additional profit for LMSI on the subcontract. Finally, MSA, LMC, LMSI, and Armijo knew that the overwhelming majority of this anticipated profit was not dependent in any way on LMSI's good performance, but was built into the false and inflated labor rates and [sic] fixed unit rates and fixed prices proposed to MSA.

ECF No. 1 at 35−36 (paragraph numbers omitted).

In February 2011, DOE conditionally consented to the subcontract with LMSI for IR/CM services, subject to removal of what DOE allegedly understood to be a one percent affiliate fee, based on Defendants' alleged misrepresentations. ECF No. 1 at 38. The Government alleges in the Complaint that

rather than carry out DOE's wishes by removing the proposed profit, which would have required LMSI to eliminate its gross inflation of its labor rates, fixed unit rates, and fixed prices, MSA, LMSI, LMC, and Armijo agreed to reduce LMSI's proposed labor rates by 1 percent— falsely and knowingly failing to disclose that its many prior false statements had led DOE to believe that the additional profit for LMSI had been 1 percent, and not the, at a minimum, 11.5 percent actually estimated by LMSI, LMC, MSA, and Armijo, and falsely and knowingly failing to disclose that this very high level of expected profit was due to the significant inflation of LMSI's labor rates, fixed unit rates, and fixed prices as set forth in LMSI's proposal.

*Id.* at 39.

### D. *False Claims Act Allegations*

In opposing Defendants' Motions to Dismiss, the Government alleges that the following are "lies, deceptive half-truths, misleading omissions, and false representations" by Defendants:

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS ~ 10

(1) LMSI and LMC's anticipated profit on the subcontract; (2) LMSI's anticipated level of effort needed to perform the work on the subcontract; (3) labor costs and rates charged by LMSI; (4) MSA's visibility into LMSI's internal cost and revenue estimates; and (5) Defendants' compliance with the Anti-Kickback Act.

ECF No. 53 at 4.

The Government alleges in its Complaint that Defendants' false statements induced DOE to consent to the subcontract and to pay the "false and inflated" rates "for the entirety of LMSI's subcontract in each and every claim that LMSI submitted to MSA under the subcontract and in each and every claim that MSA made to DOE for LMSI's grossly inflated labor rates, fixed unit rates, and firm fixed prices." ECF No. 1 at 39.

### E. *Anti-Kickback Act Allegations*

In the Complaint, the Government alleges that LMC "used its Management Incentive Compensation Program (MICP) to provide things of value to high-ranking MSA employees, including Armijo and Olsen, for their use of their MSA positions to provide favorable treatment to LMC and LMSI." ECF No. 1 at 40. LMC allegedly made the payments to LMC employees who were seconded to MSA. *See id.* at 41.

## II. PLEADING AND DISMISSAL STANDARDS

Complaints filed in federal court must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant challenges a complaint's sufficiency under Fed. R. Civ. P.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS ~ 11

12(b)(6), the court must determine whether the complaint bears "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). The Ninth Circuit has described plausibility as follows:

> When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are "merely consistent with" their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*.

*Petzschke v. Century Aluminum Co. (In re Century Aluminum Co. Sec. Litig.)*, 729 F.3d 1104, 1108 (9th Cir. 2013) (internal quotations omitted) (finding that the plaintiffs' allegations "remain[ed] stuck in 'neutral territory'" because they did not tend to exclude the possibility that the defendants' alternative explanation that excluded liability was true) (quoting *Twombly*, 550 U.S. at 557).

In deciding a Rule 12(b)(6) motion to dismiss, a court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marin Ins. Co.*,

519 F.3d 1025, 1031 (9th Cir. 2008). However, a court need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal quotation omitted).

A party must further plead claims under the False Claims Act, and any other cause of action based on alleged fraud or mistake, in satisfaction of the elevated pleading standard set forth in Fed. R. Civ. P. 9(b). *See Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019). A plaintiff must allege the circumstances constituting fraud with enough specificity "to give the defendant notice of the particular misconduct so that it can defend against the charge." *Id.* (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). The plaintiff "must allege the 'who, what, when, where, and how' of the misconduct." *Id.*

In addition, a district court is required to dismiss a claim over which it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The party asserting jurisdiction bears the burden of establishing its existence. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). When considering a motion to dismiss under Rule 12(b)(1), the Court is "not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

# III.  ANALYSIS

## A.  *False Claims Act ("FCA")*

The FCA creates liability for any person who, *inter alia*: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1).  The Government alleges that all four Defendants violated section 3729(a)(1)(A) in Count I of the Complaint and section (a)(1)(B) in Count II of the Complaint.  ECF No. 1 at 46–47.

The Ninth Circuit has identified four essential elements that must be shown to prevail under the FCA pursuant to either section 3729(a)(1)(A) or (a)(1)(B): "'(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.'"  *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1017, 1020 (9th Cir. 2018) (quoting from *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006)).

The falsity requirement may be satisfied through a showing of express false certification, meaning that defendant falsely "certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted."  *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir.

2010).  Alternatively, a plaintiff may make an implied certification claim to satisfy

the first element, in which case the plaintiff must satisfy two conditions:

> First, the claim does not merely request payment, but also makes
> specific representations about the goods or services provided; and
> second, the defendant's failure to disclose noncompliance with material
> statutory, regulatory, or contractual requirements makes those
> representations misleading half-truths.

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989,

2001 (2016); *see also Rose*, 909 F.3d at 1017, 1020 (9th Cir. 2018) (determining

that the four basic elements set out in *Hendow*, 461 F.3d at 1174, remain valid after

the Supreme Court's decision in *Escobar*, 136 S. Ct. 1989).

"Generally speaking, Rule 9(b) requires a plaintiff alleging fraud to: '1)

specify the statements that the plaintiff contends were fraudulent; 2) identify the

speaker; 3) state where and when the statements were made; and 4) explain why

the statements were fraudulent.'" *U.S. ex rel. Polansky v. Pfizer, Inc.*, No. 04-CV-

0704 (ERK), 2009 U.S. Dist. LEXIS 43438, at *10−11, 2009 WL 1456582, at * 4

(E.D.N.Y. May 22, 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.

2004)).

Defendants seek dismissal of the FCA allegations based on a failure to plead

scienter and materiality.  *See* ECF No. 58 at 7−16.

### 1.   Scienter

To act "knowingly" for purposes of the FCA, a defendant must act with

actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity

of information. 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

Defendants assert that since LMSI and MSA fully disclosed the rates that LMSI would be charging, and the GSA rates were available on the GSA website, the Government cannot establish scienter. ECF No. 69 at 14. The FCA takes issue with falsity, not negligent misrepresentation. *Id.* Defendants further emphasize that although DOE was required by the FAR to request certified cost or pricing data if it was actually prohibiting profit, DOE never requested such data and never communicated a final determination that LMSI's services were not "commercial items" as defined by the FAR. ECF No. 58 at 6. Defendants posit that the "only plausible and non-speculative inference from the allegations in the Complaint is that DOE consented to the subcontract *knowing* that LMSI could earn profit given the contract types and the commerciality of the services." *Id.* at 7 (emphasis in original). Moreover, Defendants assert that discrepancies between LMSI's internal estimates related to fixed-unit rates and fixed-price services do not establish a factual basis for the false claim allegations because internal estimates are "inherently subjective." ECF No. 59 at 19.

In the Complaint, the Government has alleged that the entity Defendants as well as an individual Defendant, Armijo, knew that the relevant rates provided by LMSI to MSA, which in turn MSA provided to DOE, were falsely inflated and included a profit despite DOE's disallowance of an affiliate fee. *See, e.g.,* ECF

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS ~ 16

No. 1 at 23, 28−29, 34−39.  Defendants argue that the full context of the

subcontract formation supports the conclusion that DOE agreed to a subcontract

that allowed for profit after a lengthy price negotiation with MSA and LMSI,

which undermines the Government's allegations regarding scienter.  However, the

Government's many allegations in the Complaint that Defendants knowingly

misled DOE tend to exclude the possibility that Defendants' benign explanation for

the ultimate subcontract is true and complete.  *See In re Century Aluminum Co.*

*Sec. Litig.*, 729 F.3d at 1108.

In reviewing the Complaint to determine whether to grant a motion to

dismiss, the Court must accept the nonmoving party's allegations as true.  *Iqbal*,

556 U.S. at 678.  In light of the Government's allegations that the entities

knowingly reported prices that the Defendants knew were inaccurate, the Court

finds that the Government has alleged sufficient information to infer that, at the

least, Defendants recklessly disregarded the truth or the falsity of information.

Therefore, the Court finds that the Government has adequately pleaded

scienter with respect to Defendants' statements prior to DOE's consent to the

IR/CM subcontract.

### 2. <u>Materiality</u>

"A false statement is material if it 'has a natural tendency to influence

agency action or is capable of influencing agency action.'"  *United States ex rel.*

*Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (quoting

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS ~ 17

*United States ex rel. Berge v. Bd. of Trustees of Univ. of Alabama*, 104 F.3d 1453, 1460 (4th Cir. 1997)). "Materiality . . . cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. "Moreover, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* at 2003−04. Courts examine the disputed transaction through the lenses of whether: (1) a reasonable person would attach importance to the allegedly false statement in determining his or her "choice of action in the transaction"; or (2) the defendant "knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Id.* at 2002−03.

In the Complaint and in defending against the Motions to Dismiss, the Government argues that the Mission Support prime contract did not allow LMC to receive any additional profit beyond what it received as a prime contractor. ECF No. 53 at 7 (citing ECF No. 1 at 11). The Government emphasizes the particular provision that a "[s]eparate additional subcontractor fee is not an allowable cost under this Contract for individual team members, or for a subcontractor, supplier, or lower-tier subcontractor that is a wholly-owned majority-owned, or affiliate of any team member." ECF No. 1 at 11; *see also* ECF No. 53 at 7. The Government further alleges in the Complaint that MSA misled DOE into believing that LMSI would not earn any profit under its subcontract with MSA, and LMSI charged

fraudulently inflated rates to MSA under the subcontract.  *See, e.g.,* ECF No. 1 at

20, 33−34.  The Government maintains that Defendants' statements and omissions

had a tendency and capacity to influence, and did influence, DOE's consent and

payment decisions and the amounts paid to Defendants.  *See* ECF No. 53 at 27.

Defendants, in rebuttal, cast the Government's theory about LMSI's

anticipated profit as a red herring because government contractors need not

disclose internal profit projections in a commercial subcontract.  *See* ECF No. 58 at

11 (citing 41 U.S.C. §§ 3503(a)(2), 3504(b); 48 C.F.R. §§ 15.403-1(b)(3), 15.404-

1(b)(1) (directing contracting officers to assess a contract for commercial items,

"without evaluating its separate cost elements and proposed profit"), and 2.101

(defining "[d]ata other than certified cost or pricing data").  The Request for

Proposals and Clause B.11 of the Mission Support prime contract both exempt

commercial items and services from a prohibition against a prime contractor

receiving a "subcontractor fee," or additional profit from a subcontractor affiliate.

*See* ECF No. 1 at 12.  Defendants maintain that the LMSI subcontract was for

"commercial" services and that DOE did not undertake the necessary legal steps to

establish that the services were not commercial.  ECF No. 58 at 9−10, 14.

Defendants further contend that since DOE could have insisted on a cost-

reimbursement subcontract or could have disallowed profit by determining that

LMSI's services were not commercial, and did not, it is implausible that

Defendants' representations of which DOE complains were material to DOE's

decision to consent to the subcontract.  *See* ECF Nos. 58 at 7, 13; 57 at 17−18.

The challenges that Defendants raise regarding the materiality element of the

Government's FCA allegations are substantial and may be successful at a later

stage in the litigation.  However, in deciding the Motions to Dismiss, the Court

finds that the allegations in the Complaint are sufficiently specific to put

Defendants on notice and to state a claim on which relief could be granted.  The

Government also has set forth adequate allegations in the Complaint, particularly

about representations made in writing during the course of negotiating DOE's

consent to the subcontract, that tend to exclude the plausibility of Defendants'

alternative explanation that the Government was fully aware of and acquiesced to

Defendants' conduct.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d at

1108 (defining plausibility, as discussed above).

The Complaint adequately alleges a scenario in which the Government was

induced to accept the subcontract with LMSI by Defendants' allegedly false

representations in the July 2009 LMSI revised proposal, the August 2009 letter

from LMSI to DOE responding to the DCAA audit, the October 2010 BAFO from

LMSI, and the November 2010 consent letter from MSA, allegedly prepared by

Armijo.  *See* ECF No. 1 at 17−19, 29−32.  Furthermore, the Government's

allegations are "specific enough to give defendants notice of the particular

misconduct which is alleged . . . so they can defend against the charge and not just

deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (internal quotation omitted).

Drawing all reasonable inferences in the Government's favor, the Court reasonably may infer that the alleged misrepresentations were capable of influencing DOE's contracting and payment decisions. *See Moss*, 572 F.3d at 969. The FCA claims will not be dismissed.

**B.** *Anti-Kickback Act Claim*

The Anti-Kickback Act ("AKA") prohibits (1) providing, attempting to provide, or offering a kickback; and (2) soliciting, accepting, or attempting to accept a kickback. 41 U.S.C. § 8702. The AKA defines a "kickback" as:

> any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract.

41 U.S.C. § 8701(2).

"Congress intended the language 'favorable treatment' be construed broadly to reach all conduct analogous to commercial bribery." *Morse Diesel Int'l, Inc. v. United States* ("*Morse Diesel*"), 66 Fed. Cl. 788, 800 (Fed. Cl. 2005).

Congress defined "person" for purposes of the AKA as "a corporation, partnership, business association of any kind, trust, joint-stock company, or individual." 41 U.S.C. § 8701(3). A "prime contractor" is a "person that has entered into a prime contract with the Federal Government." 41 U.S.C. § 8701(6).

In addition to criminal sanctions, the AKA provides for civil penalties:

> (a) **Amount.** The Federal Government in a civil action may recover from a person—
>> **(1)** that knowingly engaged in conduct prohibited by section 8702 of this title a civil penalty equal to—
>>> **(A)** twice the amount of each kickback involved in the violation; and
>>> **(B)** not more than $10,000 for each occurrence of prohibited conduct; and
>> **(2)** whose employee, subcontractor, or subcontractor employee violates section 8702 of this title by providing, accepting, or charging a kickback a civil penalty equal to the amount of that kickback.

41 U.S.C. § 8706(a).

The Government alleges that LMC, one of the parent companies of joint venture MSA and parent company of LMSI, used its MICP to provide "things of value" to MSA employees including Defendant Armijo and non-defendant Olsen in exchange "for their use of their MSA positions to provide favorable treatment to LMC and LMSI." ECF No. 1 at 40. According to the Complaint, Defendant Armijo was Vice President of LMC prior to MSA's formation. ECF No. 1 at 4. The Complaint alleges that Armijo served as MSA's Vice President for IT at the outset of the Mission Support prime contract in 2009, then left MSA in December 2009 to participate in an LMC executive program, and subsequently rejoined MSA as its President and General Manager in May 2010. *Id.* The Complaint alleges that Armijo continuously served as LMC's Vice President throughout this period. *Id.*

Defendants argue that the AKA claim fails as a matter of law because caselaw has rejected that a parent of a prime contractor is a different "person" for

purposes of AKA liability. *See* ECF No. 37 at 27. Defendants further argue that under *Skilling v. United States*, 561 U.S. 358 (2010), and other decisions, a person cannot bribe itself or its own employees. *See id.* at 20. Defendants contend that LMC, MSA, and LMSI are all the same "person" under the holding of *Morse Diesel*, 66 Fed. Cl. 788. ECF No. 59 at 8. The Court addresses each assertion in turn.

## 1. **Kickback**

In *Skilling*, the government charged defendant with committing criminal "honest services" fraud under 18 U.S.C. § 1346 based on his participation in fraudulent schemes to manipulate and misrepresent his employer's financial results to increase the value of his bonuses and stock options. 561 U.S. at 369, 413. The Court held that to receive a bribe or kickback, a person must solicit or accept "side payments from a third party in exchange" for favorable treatment. *Id.* at 413. The favorable treatment alleged in Skilling's case was making misrepresentations. *Id*. In reaching that holding, the Court distinguished between "bribes and kickbacks" and the receipt of "salary, bonuses, grants of stock and stock options." *Id.* at 369, 410, 414. The Court relied on the AKA's definition of "kickback." *Id.* at 414. By limiting the prohibition of the honest-services statute to acceptance of "bribes and kickbacks," the Court avoided striking the statute in its entirety as unconstitutionally vague. *Id.* at 405−06.

The Government's attempt in this case to characterize LMC's MICP as a vehicle for a kickback risks stretching the AKA statute "out of shape" for the same reasons examined by the Supreme Court in *Skilling.* 561 U.S. at 412 ("As to arbitrary prosecutions, we perceive no significant risk that the honest-services statute, as we interpret it today, will be stretched out of shape."). As noted above, the AKA defines a "kickback" as "money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind" that is provided to "improperly obtain or reward favorable treatment." 41 U.S.C. § 8701(2). The Court took judicial notice of the existence of the MICP Plans for years 2010, 2011, 2013, 2014, and 2015 and the fact that all of those plan documents asserted that "[o]ne objective of the [MICP] is to '[e]stablish performance goals within the meaning of Section 162(m) of the Internal Revenue Code.'" ECF No. 52 at 6 (quoting ECF Nos. 38-1 at 2; 38-2 at 2; 38-3 at 2; 38-4 at 2; 38-5 at 2; 38-6 at 2; 38-7 at 2; 38-8 at 2). As Defendants argue, and the Government does not address, an unpublished decision from the Ninth Circuit found that a payment is not for the purpose of "improperly" obtaining favorable treatment and could not be characterized as a "kickback" if the payment was made under a "regulatory regime . . . whether [the payments] violate the regulatory regime or not." *United States ex rel. Bly-Magee v. Premo*, 333 F. App'x 169, 170 (9th Cir. 2009). Similarly, the Government does not allege in the Complaint that the MICP plans are side payments. Rather, the MICP plans are standardized incentive programs for LMC executives to establish performance

goals within the meaning of Internal Revenue Code § 162(m), which addresses

performance-based based compensation.

The Court finds that the MICP incentive compensation does not qualify as a

kickback under *Skilling*, 561 U.S. at 413. Accordingly, the Court proceeds to

determine whether the Complaint alleges any payments from a third party in

exchange for favorable treatment.

## 2. <u>Affiliate Entities</u>

In *Morse Diesel*, the government pursued Anti-Kickback Act civil liability

against a corporation known as AMEC, a fifty percent owner of a joint venture, for

engaging in a fee splitting arrangement with the joint venture's unaffiliated

subcontractor. 66 Fed. Cl. at 792−93. AMEC argued that it could not be liable

because the joint venture, and not AMEC, was the prime contractor with the

government and had received the payments at issue. *Id*. at 799. Construing the

AKA's definitions of "prime contractor" and "person," the court found that

AMEC, as "a 50% owner of . . . a prime contractor," was a prime contractor under

the AKA as a matter of law. *Id.* Once *Morse Diesel* determined that AMEC, as

joint parent of the prime contractor also qualified as the "prime contractor" under

the AKA, the Court of Federal Claims determined that the commission splitting

arrangement in which AMEC engaged was a kickback. 66 Fed. Cl. at 799−800.

The Court agrees with Defendants that the holding of *Morse Diesel* may

appropriately be considered within the analogous context of how affiliate entities

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS ~ 25

have been treated for purposes of antitrust conspiracies, as both the AKA and antitrust conspiracy law target anti-competitive, conspiratorial conduct. *See Skilling*, 561 U.S. at 410 (describing a "classic kickback scheme" in which a public official "conspired with a third party" to share commissions with entities in which the official held an interest); *Morse Diesel*, 66 Fed. Cl. at 800 ("Congress intended the language 'favorable treatment' be construed broadly to reach all conduct analogous to commercial bribery."). In the antitrust context, "a parent company and its wholly owned subsidiary 'are incapable of conspiring with each other[.]'" *Arandell Corp. v. CenterPoint Energy Servs.*, 900 F.3d 623, 630 (9th Cir. 2018) (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984)); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148 (9th Cir. 2003) ("Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity.").

The Government argues that Congress has enacted a variety of statutes evidencing its intention "that the anti-kickback laws be interpreted to cover payment between affiliated persons absent an express exemption." ECF No. 53 at 64. The Government cites a Ninth Circuit case addressing kickback liability under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601−2617, for the proposition that this Circuit allows affiliated companies to be held liable for

illegal kickbacks to each other.  ECF No. 53 at 65.  The case, *Edwards v. First American Corp.*, 798 F.3d 1172 (9th Cir. 2015), interpreted a section of RESPA that exempts "affiliated business arrangements" from violating RESPA as kickback transactions if they meet certain criteria set forth in 12 U.S.C. § 2607(c)(4).  The Ninth Circuit rejected an argument from the title insurer defendant that payments made to title agencies of which the insurer was a majority owner could not amount to kickbacks because the insurer could not "refer business to itself."  798 F.3d at 1185.

The Court is not persuaded that an interpretation of RESPA and its different criteria for liability for kickback transactions is determinative of whether LMC's MICP could constitute a kickback under the AKA to MSA employees, including Armijo.  Rather, the Court relies on the broad "business association of any kind" language of the AKA's definition of "person."  41 U.S.C. § 8701(3).  While the Court accepts the Government's representation that subsidiaries are "legally distinct" from their parent companies as a "hornbook principle of corporate law," that principle does not supersede the AKA's own formulation of who and how an entity is liable under the AKA.  *See* ECF No. 53 at 51, n. 9; *Amalgamated Sugar Co. LLC v. Vilsack*, 563 F.3d 822, 831 (9th Cir. 2009) (holding that, as a matter of statutory construction, a court must follow the definition of a term expressly defined by Congress, even if the definition "varies from that term's ordinary meaning.").

The Government has not supplied persuasive authority that the AKA's definition of "person" should be read more restrictively than the language of the AKA indicates or than the court in *Morse Diesel* interpreted it to mean. Consequently, the Court finds that the Government has failed to assert the necessary elements of an AKA claim, namely a qualifying kickback and a payment between distinct persons. Therefore, the Court dismisses Count III of the Complaint in its entirety. Because the Government's allegation that MICP payments qualified as kickbacks is defective as a matter of law, and there is no allegation of third party involvement by whom a payment could be alleged, the Court finds that no additional facts could cure the deficiency, and the dismissal is with prejudice. *See Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 725−26 (9th Cir. 2000) (recognizing that a district court acts within its discretion to deny leave to amend when amendment would be futile).

## C.    *Breach of Contract*

Defendant MSA also moves to dismiss the breach of contract claim under Fed. R. Civ. P. 12(b)(1) based on an argument that the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101 *et seq*., "divests the federal district courts of jurisdiction over breach of contract claims in these circumstances." ECF No. 42 at 22. MSA argues that there is a parallel action before the Civilian Board of Contract Appeals ("CBCA") in which the Government is alleging that the affiliate

fee was unallowable, which is also at issue in the breach of contract claim alleged

by the Government's Complaint in this case. *Id.* at 28–29.

The Government responds that the breach of contract claim alleged in the

Complaint qualifies for an exception to the CDA's exclusive jurisdiction for "'any

claim involving fraud.'" ECF No. 53 at 76 (quoting *United States v. Kellogg*

*Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 160 (D.D.C. 2011) (quoting 41

U.S.C. § 605(a)). The Government argues that this Court has jurisdiction over the

breach of contract claim because Defendants' alleged "fraud is inextricably

intertwined with the breach of contract claim" with both the breach of contract and

the FCA claims depending on "the same facts and circumstances[.]" ECF No. 53

at 80−81. The Government acknowledges that the breach of contract claim is

inclusive of the matter stayed before the CBCA but contends that the breach of

contract claim is broader. *Id.* at 80−81.

The appeal before the CBCA concerns "'whether MSA breached the terms

of the Mission Support prime contract by charging [an] unallowable affiliate fee.'"

ECF No. 53 at 81 (citing MSA's Motion to Dismiss, ECF No. 42 at 26). By

contrast, the breach of contract claim in the Complaint alleges that:

> Without excuse, Defendant MSA materially breached its Mission
> Support Contract with the United States Department of Energy by: (1)
> charging inflated, unallowable, and unreasonable costs associated with
> LMSI's subcontract to MSA; (2) soliciting and accepting kickbacks
> from LMSI and LMC in return for improperly providing LMSI and
> LMC with favorable treatment with respect to LMSI's subcontract to
> MSA; (3) charging the Department of Energy for unreasonable and

unallowable subcontractor fee in violation of contractual and regulatory provisions; and (4) billing the Department of Energy for purported MSA employees "seconded" from LMC and LMSI who, in fact, were working on behalf of LMC and LMSI and to the detriment of MSA and the Department of Energy.

ECF No. 1 at 49.

MSA disputes the Government's characterization of the breach of contract and FCA claims as "inextricably intertwined," arguing that they are "separate causes of action with distinct elements." ECF No. 58 at 18. MSA rebuts that the fraud exception does not apply because the breach of contract claim before the CBCA may be decided without a determination of fraud. *See* ECF No. 58 at 18 (citing *United States v. Marovic*, 69 F. Supp. 2d 1190, 1194 (N.D. Cal. 1999)).

The CDA provides "a comprehensive administrative scheme for resolving government contract disputes, and that federal district courts lack jurisdiction over breach of contract claims subject to the CDA." *United States v. First Choice Armor & Equip.*, 808 F. Supp. 2d 68, 79 (D.D.C. 2011). Disputes regarding a contract with the federal government may only be appealed to the CBCA or the United States Court of Federal Claims. 41 U.S.C. §§ 7104(b)(1), 7105 (e)(1)(B). However, "a claim by the Federal Government against a contractor that is based on a claim by the contractor involving fraud" is exempt from the CDA's mandatory jurisdiction. 41 U.S.C. § 7103(a)(4)(B).

As in the context of the AKA, the Court acknowledges the broad language Congress utilized in defining the CDA exception. "The CDA exception applies to

claims 'involving fraud' and not merely to claims 'of fraud' or 'for fraud.'" *First Choice Armor & Equip.*, 808 F. Supp. 2d at 80.  Defendant MSA and the DOE already agreed in the CBCA proceedings that the evidence subject to discovery in the appeal concerning the contract overlaps with the discovery relating to the FCA claims before this Court.  *See* ECF No. 43-2 at 2−3.  Having already determined that the FCA claims survive the Motions to Dismiss, the Court finds that the exception to the exclusive jurisdiction of the CBCA or the Court of Federal Claims should apply, and the CDA does not strip this Court of jurisdiction over the breach of contract claim in this case.  Accordingly, Defendants' Motion to Dismiss the breach of contract claim under Fed. R. Civ. P. 12(b)(1) is denied.

### D. *Unjust Enrichment*

Defendant Armijo moves to dismiss the unjust enrichment claim as it pertains to him.  ECF Nos. 39 at 36; 57 at 19.  In state common law, unjust enrichment is an available method of recovery "for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Young v. Young*, 164 Wn.2d 477, 484 (Wash. 2008).  A claim of unjust enrichment requires a plaintiff to show that "(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Id.* at 484−85.

Armijo asserts that the only benefit that the Complaint alleges that he unfairly retained is the alleged kickback in the form of the MICP payments. ECF No. 57 at 19. Therefore, Armijo argues, the unjust enrichment claim fails, as a matter of law, alongside the AKA claim. *Id.* Armijo asserts that there is no factual allegation to support that the incentive compensation he received from his employer was at DOE's expense and that the Complaint does not allege that Armijo's salary, rather than the incentive payments, was a kickback. *See id.* at 5, 19. The Government responds that Armijo's salary from MSA is at the United States' expense because MSA was engaged in a cost-reimbursement contract with DOE. ECF No. 53 at 82. The Government further argues that even if the incentive payments from LMC were not "expensed to the United States," the costs "would have necessarily been borne out of LMC and LMSI's profit on the subcontract, the very inflated profit that was brought about through Armijo's corruption and at DOE's expense." *Id.* at 83.

The Court finds the Complaint, read in conjunction with the briefing on the Motions to Dismiss, fails to state what benefit received by Armijo that the Government is alleging was unjustly retained: was it his entire salary from MSA, his MICP incentive compensation from LMC, or some configuration of the two and possibly some other source? The Court finds that the Government's pleading fails to give Defendant Armijo notice as to how to defend himself and fails to set

forth adequate factual content to state a plausible claim for relief.  *See Iqbal*, 556 U.S. at 678.

In addition, the unjust enrichment claim is appropriate for dismissal because the claim arises out of an express contract.  *See, e.g.,* ECF No. 53 at 82 (arguing that allowing Armijo to retain his MSA salary would be unjust because MSA was contractually obligated to minimize costs while Armijo allegedly was using his MSA position to benefit LMC and LMSI).  At the motion-to-dismiss stage, district courts "have permitted the government to proceed with claims alleging FCA violations as well as claims for unjust enrichment" as alternative forms of relief. *United States ex. rel. Purcell v. MWI Corp.*, 254 F.Supp.2d 69, 79 (D.D.C. 2003) (collecting cases).  However, where the government has raised unjust enrichment or payment by mistake claims that arise out of an express contract, courts have found dismissal appropriate.  *Id.* (collecting other cases that dismissed unjust enrichment claims in light of existence of an express contract); *see also United States ex. rel. Doughty v. Or. Health & Scis. Univ.*, No. 3:13-CV-3106-BR, 2017 U.S. Dist. LEXIS 55083, at *18, 2017 WL 1364208 (D. Or. Apr. 11, 2017) (dismissing unjust enrichment claims for failure to state a claim where the claims arose from the express contracts the government alleged in the complaint).

The Court finds that dismissal of the unjust enrichment claims is appropriate because the arises from an express contract.  However, the defects in the unjust enrichment claim possibly may be cured by amendment.  For instance, there may

be additional factual allegations from which the Court could infer unjust enrichment that did not arise out of an express contract.  Therefore, the claim, as it relates to Defendant Armijo, shall be dismissed without prejudice.

Accordingly, **IT IS HEREBY ORDERED**:

1.      Defendants Lockheed Martin Corporation's and Lockheed Martin Services, Inc.'s Motion to Dismiss, **ECF No. 37**, Defendant Frank Armijo's Motion to Dismiss, **ECF No. 39**, and Defendant Mission Support Alliance, LLC's Motion to Dismiss, **ECF No. 42**, are **GRANTED IN PART** and **DENIED IN PART**.

2.      Count III for civil penalties under the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8702 and 8706 is **dismissed with prejudice**.  A judgment of dismissal regarding that count shall be entered in favor of all Defendants.

3.      Count V for equitable remedies under a theory of unjust enrichment is **dismissed without prejudice** as to Defendant Armijo.  To the extent that the Government can allege a claim for unjust enrichment that does not arise from an express contract or the dismissed AKA claim, it may file an Amended Complaint by **February 14, 2020**.

4.      Dismissal is denied regarding the remaining counts.  After the amendment deadline has passed, a scheduling conference notice shall be issued separately to establish a trial schedule in this matter.

The District Court Clerk is directed to enter this Order, enter judgment of dismissal as ordered, and provide copies to counsel and the Courtroom Deputy.

**DATED** January 13, 2020.

_s/ Rosanna Malouf Peterson_
ROSANNA MALOUF PETERSON
United States District Judge